[Civ. No. 69436. Second Dist., Div. Three. Oct. 26, 1984.]

BOSLEY MEDICAL GROUP et al., Plaintiffs and Respondents, v. NORTON R. ABRAMSON et al., Defendants and Appellants.

**COUNSEL**

Robert W. Eisfelder for Defendants and Appellants.

Marcus Crahan, Jr., and Roger J. Aull for Plaintiffs and Respondents.

OPINION

SOVEN, J.*—Defendant Norton R. Abramson, M.D., and his medical corporation appeal from a trial court order granting a preliminary injunction in favor of plaintiffs Bosley Medical Group and L. Lee Bosley, M.D.

### Facts

Plaintiff Bosley is the president and director of plaintiff Bosley Medical Group, which operates a medical facility specializing in the practice of hair transplantation and male pattern reduction surgery. Defendant Abramson is a medical doctor who practices through his professional corporation.

Defendant first wrote plaintiffs indicating an interest in plaintiffs' practice in May 1979. He was then a clinical instructor in surgery at Stanford University, board certified in ENT medicine, board eligible in emergency room medicine, a fellow in the American Academy of Ophthalmology and Otolaryngology, and had been a Stanford fellow in facial plastic and reconstructive surgery. He had been in private practice for about two years, working for a physician in Palo Alto and practicing cosmetic facial surgery. He was earning between $70,000 and $80,000 a year.

Defendant met several times in late 1979 with plaintiff Bosley or members of plaintiff medical group. Bosley told defendant that he could anticipate earning about $1 million over a five-year period.

In early 1980, plaintiffs offered defendant a position with the medical group. Defendant began work with plaintiff medical group on May 13, 1980. About two weeks later,[1] plaintiff Bosley gave defendant an independent contractor's agreement and a stock purchase agreement and advised defendant that he would have to sign those agreements if he wished to stay with the group.

The independent contractor agreement provided that defendant would be paid a percentage of the gross fees, defined defendant's obligations to plaintiff medical group, and stated that either party could terminate the agreement on five days' notice.

---

*Assigned by the Chairperson of the Judicial Council.

[1] The agreements were "made as of" May 13, 1980, but defendant said he was not given the agreements until two weeks later.

The stock purchase agreement provided as follows: Defendant was required to buy nine shares, equal to 9 percent, of plaintiff medical group stock at a price of $10,000, to be paid through a promissory note. He agreed to resell the shares to plaintiffs if he left the medical group, and plaintiffs agreed to pay defendant the purchase price plus 10 percent a year for the shares. Defendant also agreed that for three years after he left plaintiff medical group, he would not engage in a practice similar to plaintiffs' practice within certain counties. The purpose of the stock purchase agreement was to provide an "additional incentive" for defendant.

Defendant worked for the medical group from May 1980 through December 31, 1982. He earned the following amounts: In 1980, $60,500; in 1981, $207,100; in 1982, $158,300.[2] He also received a total of $1,417 in dividends on the shares but paid $1,633 in interest on the promissory note for the shares.

In 1980, the net receipts of plaintiff medical group were $864,000, of which plaintiff Bosley received $841,000 in salary and pension contributions, with about $23,000 remaining for distribution to the shareholders. In 1981, plaintiff medical group's net receipts were again about $864,000, of which plaintiff Bosley received $810,000 as salary, with $54,000 remaining for distribution to shareholders. Plaintiff Bosley apparently owned at least 73 percent of the stock in plaintiff medical group.

Various disputes arose between the parties. Defendant quit the group, as noted, effective December 31, 1982, and sold back his shares to plaintiff medical group. He immediately opened a practice under the name of the California Hair Transplant Center Medical Group. He advertised that he had performed over 75,000 grafts and over 450 scalp reductions. Until defendant came to work for plaintiff medical group, he had performed one scalp reduction and about ten hair transplantation surgeries.

In January 1983, plaintiffs filed a complaint alleging a breach of contract and seeking declaratory and injunctive relief. In June 1983, the court granted a preliminary injunction. Defendant was enjoined, consistent with the stock purchase agreement, from engaging in the business or practice of hair restoration services within six Southern California counties and San Francisco.

### Discussion

Defendant contends that the stock purchase agreement is a sham devised to circumvent state policy against agreements in restraint of business and

---

[2]In November 1981, a fire at plaintiff medical group's offices resulted in a loss of business for some months.

professions, that plaintiff medical group corporation is merely a "pass through" for the benefit of plaintiff Bosley, that the form stock purchase agreement is an unconscionable adhesion contract, and that defendant and his medical corporation were not competing with plaintiffs.

We agree that the stock purchase agreement is a sham devised to circumvent our state policy against agreements which prevent the practice of a business or profession, and need not reach any other issue raised by defendant. We conclude that the provision contained in the stock purchase agreement that defendant will not compete with plaintiffs for a three-year period is void and unenforceable.

In the trial court and on appeal, plaintiffs rely on Business and Professions Code section 16601. That section, discussed in detail below, provides as relevant: ". . . [A]ny shareholder . . . selling . . . all his shares . . . may agree with the buyer to refrain from carrying on a similar business. . . ."

Section 16601 is contained in that portion of the Business and Professions Code dealing with contracts in restraint of trade. Section 16600 provides generally that contracts which prevent anyone from engaging in a lawful profession, trade or business are void. Section 16601 provides generally that any one who sells the goodwill of a business or all the shares of a corporation may agree to refrain from carrying on a similar business. Section 16602 provides generally that any partner as part of a partnership dissolution may agree not to compete with the former partnership business.

■ Although at common law and in many states, a restraint on the practice of a trade or occupation, even as applied to a former employee, is valid if reasonable (see Rest.2d Contracts, § 188, pp. 45-47; 14 Williston on Contracts (3d ed. 1972) § 1636, p. 88, et seq., § 1637, p. 103, et seq.), the so-called rule of reasonableness was rejected by this state in 1872. That year Civil Code sections 1673 through 1675—the predecessor sections to Business and Professions Code sections 16600 through 16602—were enacted. At least since 1872, a noncompetition agreement has been void unless specifically authorized by sections 16601 or 16602. (See Note (1953) 26 So.Cal.L.Rev. 208, 209.)

Thus, an agreement by an employee or independent contractor not to compete with his employer after leaving that employment is void. (E.g., *Gordon Termite Control* v. *Terrones* (1978) 84 Cal.App.3d 176, 178 [148 Cal.Rptr. 310].) Before section 16601 was amended in 1945, a person who sold all his shares in a corporation could not be enjoined from competing with the buyer because the seller could not dispose of the goodwill of the

corporation. (*Merchants' Ad-Sign Co.* v. *Sterling* (1899) 124 Cal. 429, 434 [59 P. 468]; see also *Radiant Industries, Inc.* v. *Skirvin* (1973) 33 Cal.App.3d 401, 403 [109 Cal.Rptr. 96].)

In 1945, however, Business and Professions Code section 16601 was amended to read: "Any person who sells the goodwill of a business, *or any shareholder of a corporation selling or otherwise disposing of all his shares* in said corporation, . . . may agree with the buyer to refrain from carrying on a similar business. . . ." (Stats. 1945, ch. 671, § 1, p. 1341.)[3]

In 1963, section 16601 was amended to add any shareholder who sells "all or substantially all" of a corporation's "operating assets together with the goodwill of the corporation" or of a division or subsidiary of the corporation, "or all of the shares of any subsidiary, . . ."

In summary, until 1945, only a person selling the goodwill of a business or a partner in a dissolving partnership could enter into an enforceable noncompetition agreement. In 1945, another exception was made for "any shareholder . . . selling . . . all his shares. . . ."

The purpose of the 1945 amendment to section 16601 is contained in a letter from sponsoring Senator Quinn and a memorandum prepared for the committee which twice approved the bill in its amended form (see 1945 Leg. J., Sen. Bill No. 984) and for the Governor who signed the bill. The memorandum points out that the court's interpretation in *Merchants' Ad-Sign Co.* v. *Sterling, supra,* 124 Cal. 429, was very technical, and was based on the fact that when the predecessor sections to Business and Professions Code sections 16600, 16601 and 16602 were enacted, "the small trading corporation was practically unknown and partnership was the vogue . . . ." The memorandum states that the benefits of the amendment to section 16601 would flow most conspicuously to the "stockholder in relatively small corporations . . . where the customers or clients have become used to and appreciate the personal service of the vendor stockholder. . . ." In

---

[3]Business and Professions Code section 16601 now reads in entirety: "Any person who sells the goodwill of a business, or any shareholder of a corporation selling or otherwise disposing of all his shares in said corporation, or any shareholder of a corporation which sells (a) all or substantially all of its operating assets together with the goodwill of the corporation, (b) all or substantially all of the operating assets of a division or a subsidiary of the corporation together with the goodwill of such division or subsidiary, or (c) all of the shares of any subsidiary, may agree with the buyer to refrain from carrying on a similar business within a specified county or counties, city or cities, or a part thereof, in which the business so sold, or that of said corporation, division, or subsidiary has been carried on, so long as the buyer, or any person deriving title to the goodwill or shares from him, carries on a like business therein. For the purposes of this section, 'subsidiary' shall mean any corporation, a majority of whose voting shares are owned by the selling corporation."

such cases, "the ability of the vendor stockholder to validly undertake that he will not engage in competition with the corporation, of which he has ceased to be a stockholder, may well mean that he can not get the price for his shares which he might if such a contract were sanctioned by the law."

In brief, the purpose of the 1945 amendment was to permit the "owner" of a small corporation to agree not to compete in connection with selling his entire interest in that corporation.

■ Plaintiffs' contention that we cannot consider Senator Quinn's letter and memorandum is without merit. Although the motives or understanding of individual legislators cannot be considered in determining the meaning of the bill, a legislator's statement is entitled to consideration "when it is a reiteration of legislative discussion and events leading to adoption of proposed amendments rather than merely an expression of personal opinion." (*California Teachers Assn.* v. *San Diego Community College Dist.* (1981) 28 Cal.3d 692, 700 [170 Cal.Rptr. 817, 621 P.2d 856].) Here, as noted, the text of the memorandum indicates that it was submitted to members of the committee who reviewed and approved the bill. We are entitled to assume that the Legislature intended to accomplish the objectives stated in the memorandum. (See *Southland Mechanical Constructors Corp.* v. *Nixen* (1981) 119 Cal.App.3d 417, 429 [173 Cal.Rptr. 917].)

■ We are satisfied that the Legislature, in amending section 16601, intended to permit noncompetition agreements only in situations in which the transfer of "all" of the owner's shares involves a substantial interest in the corporation so that the owner, in transferring "all" of his shares, can be said to transfer the goodwill of the corporation.

This interpretation permits a harmonious reading of section 16601, as it existed before the 1945 amendment, section 16602, discussed above, which permits noncompetition agreements as part of a partnership dissolution, and the 1963 amendments to section 16601, discussed above, which permit noncompetition agreements where substantially all of the assets and goodwill of a corporate subsidiary or division are sold.[4]

■ Plaintiffs contend that the statute is unambiguous and therefore the court is obliged to apply the statute literally. (*Morse* v. *Municipal Court* (1974) 13 Cal.3d 149, 156 [118 Cal.Rptr. 14, 529 P.2d 46].) Statutes must, however, "be construed in a reasonable and common sense manner consis-

---

[4]The 1963 amendments also provided for noncompetition agreements where "all" of a subsidiary's shares were sold, thus tracking the 1945 language as to the corporation.

tent with their apparent purpose and the legislative intent underlying them—one practical, rather than technical, and one promoting a wise policy rather than mischief or absurdity. [Citations.]" (*Herbert Hawkins Realtors, Inc.* v. *Milheiser* (1983) 140 Cal.App.3d 334, 338 [189 Cal.Rptr. 450].) A rule of strict construction must give way if a literal application of the language will lead to an absurd result. (See *Touli* v. *Santa Cruz County Title Co.* (1937) 20 Cal.App.2d 495, 499 [67 P.2d 404].)

■ Literally applied, section 16601 would permit a major public corporation to require any employee to purchase one of several million shares and to enter into an agreement not to work for a competitor—an absurd result, and contrary to this state's policy prohibiting such agreements. Even on the facts of this case, a literal interpretation of section 16601 leads to a mischievous and absurd result.

First, defendant was required, not permitted, to purchase the shares. Defendant was not intended to benefit from forced corporate participation. Moreover, even that forced participation was limited: The overwhelming majority of those shares was owned by plaintiff Bosley and control of the corporation remained at all times with plaintiff Bosley. Nor could defendant significantly benefit from the payment of dividends or a capital gain in the value of the stock. The interest he paid on the promissory note exceeded the amount he received in dividends; he received the purchase price plus only 10 percent when he left the group.

Second, the stated purpose of the stock purchase agreement makes little sense. The agreement states that plaintiff Bosley "desires to transfer certain shares of stock" to defendant as an "additional incentive" for defendant and "in order to achieve a professional relationship" between defendant, plaintiffs and "other medical practitioners associated" with plaintiffs. Since plaintiff Bosley had represented to defendant potential earnings exceeding $200,000 a year—and in 1981, defendant in fact earned $207,000—the mandatory purchase of $10,000 worth of stock would not provide an additional incentive to any one seeking incentives. Moreover, the "professional relationship" to be achieved was assured by the independent contractor agreement, which closely controlled the conduct of defendant and other associated professionals, and permitted plaintiffs to fire defendant on five days' notice.

In short, the stock purchase agreement was devised to permit plaintiffs to accomplish that which the law otherwise prohibited: an agreement to prevent defendant from leaving plaintiff medical group and opening a competitive practice.

We emphasize that in examining the stock purchase agreement, the issue is not whether the consideration was adequate or whether defendant was unfairly compelled to sign the agreement. Those are separate issues that we need not and do not reach. Rather, we have examined the stock purchase agreement only to determine whether plaintiffs have provided any justification for a literal application of section 16601. They have not.

We note also that the issue is not whether it is fair for defendant to leave plaintiff medical group with skills arguably developed by plaintiff Bosley and the group, and become plaintiffs' competitor. That issue has long since been decided against plaintiffs. (E.g., *New Method Laundry Co.* v. *MacCann* (1916) 174 Cal. 26, 31 [161 P. 990].)

We are satisfied that under any interpretation of section 16601, other than the literal interpretation proposed by plaintiffs, the stock purchase agreement involved in this case is a sham created to avoid the prohibitions of section 16600. We conclude that any agreement by defendant not to compete with plaintiffs is void under section 16600 and is not enforceable.

The judgment (order granting a preliminary injunction) is reversed.

Klein, P. J., and Arabian, J., concurred.

A petition for a rehearing was denied November 14, 1984, and respondents' petition for a hearing by the Supreme Court was denied December 20, 1984.