127 P.3d 121

**INTERMOUNTAIN EYE AND LASER CENTERS, P.L.L.C., Plaintiff–Appellant,**

v.

**Mark MILLER, M.D., Defendant–Respondent.**

No. 31058.

Supreme Court of Idaho, Boise, September 2005 Term.

Dec. 20, 2005.

Eberle, Berlin, Kading, Turnbow, McKlveen & Jones, Chartered, Boise, Idaho, for appellant. Warren E. Jones argued.

Holland & Hart, LLP, Boise, Idaho for respondent. Amanda K. Brailsford argued.

JONES, Justice.

Intermountain Eye and Laser Centers sued Dr. Mark Miller in October 2003 contending the doctor breached the terms of a "post-termination competition" provision in the parties' employment agreement. After the parties filed cross-motions for summary judgment the district court ruled Dr. Miller did not violate the terms of the non-compete provision because the non-compete period had expired, and, even if it had not, the terms of the non-compete provision were unreasonable and, therefore, unenforceable. The court granted Dr. Miller's motion, denied Intermountain Eye's motion, dismissed the firm's complaint, and awarded Dr. Miller his costs and attorney fees. This timely appeal followed.

## I.

### BACKGROUND

Intermountain Eye is a professional medical services firm with two locations in Boise, one in Eagle, and one in Nampa. As the firm's name might suggest, it provides ophthalmology services to its patients. It currently employs eight full-time physicians and two part-time physicians. Dr. Miller is a licensed ophthalmologist, refractive surgeon, and cornea specialist. He earned a degree in medicine in 1994, completed a one-year internship, and then a three-year residency in ophthalmology. After that, he completed a one-year fellowship, which concluded in 1999. In June 1999, he accepted Intermountain Eye's offer to join the firm as a cornea and refractive specialist. The doctor began working for the firm on August 1, 1999, but declined to sign the firm's standard employ-ment agreement. Instead, he and the firm spent the next ten months negotiating the terms of his employment. Each side had the assistance of legal counsel. A "Physician Employment Agreement" was signed in June 2000, its terms effective beginning August 1, 1999.

The post-termination competition provision at issue in this case is found at Section 3.3 of the Agreement. It reads:

> **3.3 Post–Termination Competition.** The Company and the Physician agree that the Company has agreed to expend considerable time, energy and expenses in assisting the Physician in developing a viable medical practice. In consideration of the preceding, the Physician agrees that for the period of 2 years immediately following the termination of the Physician's employment with the Company for any or no reason (excluding only termination for default by the Company, but including expiration of the term of this Agreement), the Physician shall not engage in the practice of medicine within Ada and Canyon County unless the Physician pays to the Company a Practice Fee in accordance with the following schedule (and such amount shall be offset against any amounts due from the Company to the Physician under this Agreement and the Operating Agreement)[.]

The section goes on to provide that if Dr. Miller is terminated on or before July 31, 2000, the practice fee is $250,000; after August 1, 2000, it is $500,000. Finally, the non-compete provision provides:

> The Physician has carefully considered the nature and extent of the restrictions upon the Physician and the rights and remedies conferred upon the Company under this Section, agrees that the restrictions, rights, and remedies are reasonable in time, application, amount, and effect, agrees that the restrictions are supported by sufficient consideration and are not disproportionate to the respective benefits conferred upon the Physician by this Agreement, and acknowledges that the restrictions will not prevent the Physician from earning a living.

Section 3.1 of the Agreement provides: "The term of this Agreement shall commence on August 1, 1999 ... and shall continue until July 31, 2001 unless terminated earlier in accordance with Section 3.2 [addressing termination methods]." Section 3.2 contemplates three methods of termination: by the firm; by the physician; or automatically upon the occurrence of certain events, none of which occurred during the Agreement's specified term.

In June 2000, Dr. Miller and the firm renegotiated the compensation component of the Agreement. The reworked compensation package became effective August 1, 2000. No other amendments to the Agreement were made. Prior to July 31, 2001, members of Intermountain Eye discussed with Dr. Miller the need to sign a new employment agreement, but July 31, 2001 (the Agreement's expiration date) came and went and Dr. Miller remained employed at Intermountain Eye without having signed a new agreement. In May 2002, Intermountain Eye sent Dr. Miller two addendums to the firm's employee manual and a memorandum asking Dr. Miller to acknowledge receipt of the addendums. Addendum 1 contained the heading, "Employment at Will" and provided that "[e]mployment at [Intermountain Eye] is at will. This means that either you or [Intermountain Eye] may terminate the employment relationship at any time for any reason." Dr. Miller signed the memo and returned it to the appropriate location. In June 2002, Intermountain Eye provided Dr. Miller with another employment agreement that contained terms slightly different than the original Agreement. It contained a non-compete provision that was also slightly different than the previous one. Dr. Miller never signed the new agreement, and the parties' employment relationship ended on February 16, 2003, when Intermountain Eye terminated Dr. Miller, apparently upon his repeated refusal to sign another employment agreement.

Dr. Miller did not practice medicine until August 2003, when he joined St. Luke's Regional Medical Center as an ophthalmologist. His practice is in Meridian, Idaho, apparently in a space previously occupied by Intermountain Eye. A month before Dr. Miller opened up his new office, Intermountain Eye, having learned of Dr. Miller's intention to open a new office, sent Dr. Miller a letter explaining that the non-compete provision in the doctor's contract had not expired and that if he intended on practicing medicine in Ada County, he must pay the practice fee. Through his attorneys, Dr. Miller informed Intermountain Eye that he would not pay the fee and that he would practice medicine in Ada County.

Intermountain Eye filed a complaint in October 2003, seeking to recover the $500,000 practice fee. Discovery ensued and in May 2004 Intermountain Eye moved for summary judgment. That June, Dr. Miller moved for summary judgment. The district court ruled in Dr. Miller's favor, writing in its memorandum decision that the non-compete provision unambiguously began to run on July 31, 2001 (the Agreement's expiration date), and the fact that Dr. Miller remained employed beyond that date was of no moment. The district court also ruled that even if the non-compete provision survived July 31, 2001, its terms were unreasonable and the Agreement was, therefore, unenforceable. In reaching this conclusion, the court relied on *Pinnacle Performance, Inc. v. Hessing,* 135 Idaho 364, 17 P.3d 308 (Ct.App. 2001). A judgment followed, dismissing Intermountain Eye's complaint and awarding Dr. Miller his attorney fees and costs.

## II.

### THE ISSUES

1. Whether the district court correctly determined that the non-compete provision was unambiguous.

2. Whether the non-compete provision is unenforceable as written, and, if so, whether the district court should have "blue-penciled" it to make it enforceable.

3. Whether the district court's award of attorney fees was proper.

## III.

### ANALYSIS

**A. Standard of Review.**

The district court decided this case based on the parties' cross-motions for summary

judgment. The applicable standard of review is set out in *Shawver v. Huckleberry Estates, LLC*, 140 Idaho 354, 360, 93 P.3d 685, 691 (2004):

> On appeal from the grant of a motion for summary judgment, this Court employs the same standard as used by the district judge originally ruling on the motion. *Wensman v. Farmers Ins. Co. of Idaho*, 134 Idaho 148, 151, 997 P.2d 609, 612 (2000) (citing *McKay v. Owens*, 130 Idaho 148, 152, 937 P.2d 1222, 1226 (1997)). Summary judgment is proper 'if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.' I.R.C.P. 56(c). The fact that both parties move for summary judgment does not in and of itself establish that there is no genuine issue of material fact. *Kromrei v. AID Ins. Co.*, 110 Idaho 549, 551, 716 P.2d 1321 (1986) (citing *Casey v. Highlands Ins. Co.*, 100 Idaho 505, 507, 600 P.2d 1387, 1389 (1979)). The fact that the parties have filed cross-motions for summary judgment does not change the applicable standard of review, and this Court must evaluate each party's motion on its own merits. *Stafford v. Klosterman*, 134 Idaho 205, 207, 998 P.2d 1118, 1119 (2000) (citing *Bear Island Water Ass'n, Inc. v. Brown*, 125 Idaho 717, 721, 874 P.2d 528, 532 (1994)).

This case was to be tried to the court because neither party had requested a jury trial. In such a circumstance, *Shawver* says:

> When an action will be tried before the court without a jury, the trial court as the trier of fact is entitled to arrive at the most probable inferences based upon the undisputed evidence properly before it and grant the summary judgment despite the possibility of conflicting inferences. *Id.* (citing *Brown v. Perkins*, 129 Idaho 189, 191, 923 P.2d 434, 436 (1996); *Loomis v. Hailey*, 119 Idaho 434, 437, 807 P.2d 1272, 1275 (1991)). The test for reviewing the inferences drawn by the trial court is whether the record reasonably supports the inferences. *Id.* (citing *Walker v. Hollinger*, 132 Idaho 172, 176, 968 P.2d 661,

665 (1998); *Riverside Dev. Co. v. Ritchie*, 103 Idaho 515, 518–19, 650 P.2d 657, 660–61 (1982)).

140 Idaho at 360–61, 93 P.3d at 691–92.

## B. Whether the Non–Compete Provision is Ambiguous.

Both sides contend that the language employed in the non-compete provision is clear and unambiguous. However, the parties vigorously assert substantially differing interpretations of the "unambiguous" language. According to Intermountain Eye, the two-year term of the non-compete began to run on February 16, 2003, when Dr. Miller's employment was terminated. On the other hand, Dr. Miller argues that the two-year term began to run when the Agreement expired on July 31, 2001, so that he was released from the provisions of the non-compete on July 31, 2003. It is obvious that both parties cannot be correct about their interpretation of the allegedly clear and unambiguous language.

With regard to the matter of contract interpretation, *Shawver* provides the following guidance:

> When the language of a contract is clear and unambiguous, its interpretation and legal effect are questions of law. *State v. Barnett*, 133 Idaho 231, 234, 985 P.2d 111, 114 (1999). An unambiguous contract will be given its plain meaning. *Id.* The purpose of interpreting a contract is to determine the intent of the contracting parties at the time the contract was entered. *Opportunity, L.L.C. v. Ossewarde*, 136 Idaho 602, 607, 38 P.3d 1258, 1263 (2002) (citing *Rutter v. McLaughlin*, 101 Idaho 292, 612 P.2d 135 (1980)). In determining the intent of the parties, this Court must view the contract as a whole. *Daugharty v. Post Falls Highway Dist.*, 134 Idaho 731, 735, 9 P.3d 534, 538 (2000). If a contract is found ambiguous, its interpretation is a question of fact. *Id.* (citing *Electrical Wholesale Supply Co. Inc. v. Nielson*, 136 Idaho 814, 823, 41 P.3d 242, 251 (2001)). Whether a contract is ambiguous is a question of law. *Boel v. Stewart Title Guar. Co.*, 137 Idaho 9, 13, 43 P.3d 768, 772 (2002) (citing *Terteling v. Payne*, 131 Ida-

ho 389, 391–92, 957 P.2d 1387, 1389–90 (1998)).

140 Idaho at 361, 93 P.3d at 692.

■ The district court reviewed the non-compete provision and concluded the language, "for the period of 2 years immediately following the termination of the Physician's employment with the company for any or no reason ( ... including the expiration of the term of this Agreement)", unambiguously meant that, at the latest, the two-year non-compete term would begin to run when the Agreement itself expired. The plain language, the court wrote, "cannot be read to allow the triggering of this non competition clause beyond the term of the entire Agreement." The court considered the language in the parenthetical phase—"(excluding only termination for default by the Company, but including expiration of the term of this Agreement)"—to refer back to "termination of the Physician's employment."

While this reading is certainly plausible, Intermountain Eye urges an equally plausible reading of the non-compete provision, i.e., that it began to run immediately following the termination of Dr. Miller's *employment.* The firm argues the provision was intended to survive the end of the contract term in the event Dr. Miller's employment continued beyond that point and that the noncompete was intended to trigger only when such continued employment ended.[1] According to Intermountain Eye, the language in parentheses—"including expiration of the term of this Agreement"—which the district court relied on in its ruling, refers to the reason for termination of Dr. Miller's employment ("any or no"), excepting default by the firm, but including the expiration of the Agreement. It does not refer to the timing of the doctor's departure. That is, the language in parentheses refers back to "reason" rather than to "termination". By writing "including expiration of the terms of this Agreement," the parties were specifically stating that if Dr. Miller left concurrent with the end of the Agreement, the two-year non-compete period would then begin to run. This phrase, then, does not, by itself, provide a separate mechanism by which the provision is triggered. As Dr. Miller points out, it is fairly obvious, without the Agreement saying so, that if he were to leave the firm upon the expiration of the Agreement, the non-compete provision would begin to run. Nevertheless, the parties' insistence on expressly saying it, even at the cost of redundancy, should not give it more meaning than the plain language allows.

The Agreement is ambiguous, at least as pertains to the non-compete provision. There are at least two plausible interpretations as to when the non-compete was intended to begin running. The district court erred in holding the provision to be unambiguous and in interpreting the language to cause the non-compete to commence upon the termination of the Agreement without consideration of evidence beyond the language of the contract. Rather than being a question of law, the interpretation of the contract provision required a factual inquiry that precluded the determination of the issue on this summary judgment. Judgment on this issue is vacated and the case is remanded for determination through a factual inquiry.

**C. Whether the Non–Compete Provision Is Unenforceable as Written, and, if so, Whether the District Court Should Have "Blue–Penciled" It To Make It Enforceable.**

The district court also granted summary judgment to Dr. Miller, based on a holding

---

1. By assigning plausibility to the contention that the non-compete survives the end of the contract term, we do not mean to imply that such a provision could survive for an indefinite period of time. As with other types of restrictions and limitations in a non-compete agreement, if the facts show the parties intended the provision to survive, the court would need to determine what duration of survival would be reasonable under the circumstances of the case. The survival of the provision would also depend upon any subse-quent agreement or actions of the parties with regard to the terms and conditions of employment. For example, Intermountain Eye's insistence that Dr. Miller accept at-will employment, and his acceptance thereof, could be determined, depending on the facts, to effect either a triggering or possibly elimination of the non-compete provision. These and other issues will need to be examined and determined in further factual inquiry.

that the practice restrictions contained in the Agreement were unreasonable. The court analyzed the Agreement under the Court of Appeals' decision in *Pinnacle Performance*, holding that the non-compete provision was unreasonably broad, making it unenforceable. The firm contends that the district court erred by placing reliance on *Pinnacle Performance*. Intermountain Eye contends that *Marshall v. Covington*, 81 Idaho 199, 339 P.2d 504 (1959), which upheld a non-compete provision similar to the one in this case, should have been applied and would have resulted in a judgment in its favor. According to Intermountain Eye, even if the non-compete provision is overbroad, the district court should nonetheless have "blue-penciled" it to make it enforceable. Dr. Miller, on the other hand, contends that *Marshall* is distinguishable from the facts of this case and that the court correctly applied the rules from *Pinnacle Performance*. The doctor also contends that the non-compete provision is so far beyond the scope of reasonable that it is not subject to the blue-pencil rule.

### 1. The district court's ruling.

The district court ruled that the fatal flaw in the non-compete provision was "the prohibition on engaging in the extremely broad activity of the 'practice of medicine' ..." For that reason, the court ruled the non-compete provision was overbroad. It wrote that Intermountain Eye had a protectable interest in "the customer relationships developed while the employee was working there." Having done so, the court offered three reasons for deeming the non-compete provision unenforceable. First, the provision did not "differentiate at all between the patients from whom [Dr. Miller] may solicit business and the patients from whom he may not." Second, the court noted that the proscribed activity included both the sort of practice in which Intermountain Eye was engaged and every other kind of medical practice. Finally, the court noted that "disallowing a trained physician from practicing *any* kind of medicine in this two county area to treat *any* individuals in need is also extremely detrimental to the general public." The firm did argue that if the court found the non-compete provision unenforceable as written, it

should blue-pencil it to make it enforceable, but the court did not do so and offered no explanation for not doing so.

### 2. General rules applicable to non-compete provisions in employment contracts.

Covenants not to compete in employment contracts are "disfavored" and "strictly construed against the employer." *Freiburger v. J–U–B Engineers, Inc.*, 141 Idaho 415, 419, 111 P.3d 100, 104 (2005); *Stipp v. Wallace Plating, Inc.*, 96 Idaho 5, 6, 523 P.2d 822, 823 (1974). Non-compete provisions must be reasonable, which is to say they must not be more restrictive than necessary to protect a legitimate business interest, must not be unduly harsh and oppressive to the employee, and must not be injurious to the public. *Id.* at 420, 111 P.3d at 105.

The non-compete provision in this case is a hybrid of sorts. The provision does not place an absolute prohibition on Dr. Miller's ability to practice. Rather, it allows him to practice, provided that he pays a practice fee. To the extent it allows Dr. Miller to buy back into the market should he decide to practice in the designated areas within the designated time period, the non-compete provision is somewhat analogous to a liquidated damages clause. Parties to a contract may agree in advance to the amount of damages in case of breach. *See Graves v. Cupic*, 75 Idaho 451, 456, 272 P.2d 1020, 1023 (1954). The damages must bear a "reasonable relationship to actual damages." *Id.* At oral argument, counsel for Intermountain Eye was asked whether the practice fee was a liquidated damages clause. The response was no: it was reimbursement for the firm's investment in Dr. Miller's practice. Whether it is properly characterized as reimbursement or something else, we need not decide; it is, in substance, a component of the non-compete provision. It just happens to be a restriction in the form of money, rather than duration or scope. As with other restrictions, under non-compete rules this amount must be no more restrictive than necessary to protect Intermountain Eye's business interests. Assuming that recouping its invest-

ment in Dr. Miller is a protectable business interest, the amount must be no more restrictive than necessary to protect such interest.

■ Accordingly, to determine whether the restrictions are reasonable, one must determine whether or not the amount of the practice fee is more restrictive than necessary to protect its interest—in this case, its investment in Dr. Miller.[2] On the record in this case, there is no way to determine the issue of the reasonableness of the fee on summary judgment. The firm alleges that it expended a great amount of resources in developing Dr. Miller's practice for him, it provided him a substantial number of patients, it spent a good deal of money in advertising and patient development, and that the amount of the practice fee was well justified by the economics. Even though non-compete provisions are disfavored and must be found to be reasonable in order to survive judicial scrutiny, it appears that the state of the record does not allow for determination that the practice fee is unreasonable, as a matter of law. That determination must be made upon further factual inquiry, not upon summary judgment. In determining the reasonableness of the restrictions, the court need also inquire as to all cognizable business interests that the firm sought to protect.

### 3. Intermountain Eye's protectable business interests.

■ The district court described Intermountain Eye's protectable business interest as the "customer relationships" that were developed while Dr. Miller was employed there. Intermountain Eye contends that the court erred in failing to consider other interests that were subject to protection by virtue of the non-compete provision. Before one can decide whether the non-compete provision is overbroad, one must first identify the

firm's legitimate business interests. Whether an employer has a protectable business interest is typically a question of law to be determined from all the facts. *Eastern Dist. Co., Inc. v. Flynn*, 222 Kan. 666, 567 P.2d 1371 (1977). Intermountain Eye asserts four protectable business interests: (1) the fact that "the Company has agreed to expend considerable time, energy and expenses in assisting the Physician in developing a viable medical practice"; (2) the proprietary and "commercially sensitive" information to which Dr. Miller had access; (3) referral sources; and (4) patients Dr. Miller inherited and the new patients the firm contends it supplied him.

### (a) The firm has protectable interests in its proprietary information, its referral sources, and patient relationships "established and/or nurtured" by Dr. Miller during his employment with the firm.

■ Generally speaking, non-compete provisions are permissible means to protect employers from their former employees who would use proprietary or other confidential business information to compete against them. *See, e.g., Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 540 (Wyo.1993). And medical services firms, particularly those providing specialized care, generally have protectable interests in referral sources. *Valley Med. Specialists v. Farber*, 194 Ariz. 363, 982 P.2d 1277, 1284 (1999) (citing *Medical Specialists, Inc. v. Sleweon*, 652 N.E.2d 517, 523 (Ind.Ct.App.1995)); *Weber v. Tillman*, 259 Kan. 457, 913 P.2d 84, 91 (1996); *Ballesteros v. Johnson*, 812 S.W.2d 217, 223 (Mo.Ct.App.1991).

■ An employer also has "a protectable interest in the customer relationships its former employee established and/or nurtured while employed by the employer and is entitled to protect itself from the risk that a

---

**2.** Since the practice fee is a component of the non-compete provision, it might also be subject to blue penciling, if it is determined to be unenforceable as written. *See Stipp v. Wallace Plating*, 96 Idaho at 7, 523 P.2d at 824 (courts may modify a restrictive covenant to make it reasonable, if it is not so lacking in essential terms that would protect the employee); *Insurance Ctr. v.*

*Taylor*, 94 Idaho 896, 899, 499 P.2d 1252, 1255 (1972) (purpose of the blue pencil rule is to "escape the rule of arbitrary refusal to enforce a covenant which, while unreasonable and indefinite in some of its terms, *nevertheless serves to protect the legitimate interests of the parties or the public as the case may be. . . .* ") (Emphasis added.)

former employee might appropriate customers by taking unfair advantage of the contacts developed while working for the employer." *Freiburger*, 141 Idaho at 420, 111 P.3d at 105 (quoting *W.R. Grace & Co. v. Mouyal*, 262 Ga. 464, 422 S.E.2d 529, 531 (1992)). This rule recognizes the general point of non-compete provisions in the first place: to protect employers from "the detrimental impact of competition by employees who, but for their employment, would not have had the ability to gain a special influence over clients or customers." *Id.* So, these asserted interests are protectable.

#### (b) A medical services firm may justify a non-compete provision based on the "time, energy, and expenses" it expended in assisting a professional establish a practice.

Whether an employer may justify a non-competition provision based on the time, energy, and money expended in assisting the employee establish a professional practice, however, is less clear. No previous decision of this Court has squarely addressed the issue. At least two other courts have held that a physician-employer's investment in an employee may establish a protectable interest and that a non-compete provision may be a legitimate means to protect the employer's investment in its own business and goodwill. *See Weber v. Tillman*, 913 P.2d at 92; *see also Retina Services, Ltd. v. Garoon*, 182 Ill.App.3d 851, 131 Ill.Dec. 276, 538 N.E.2d 651 (1989) (medical practice is a protectable interest). But another case has cautioned that experience and skill gained by the employee during his employment cannot, by itself, justify a non-compete provision in a physician's contract—there must be something about that employment that gives the employee an unfair advantage. *See Fields Found., Ltd. v. Christensen*, 103 Wis.2d 465, 309 N.W.2d 125 (Ct.App.1981); *see also* Harlan M. Blake, *Employee Agreements Not To Compete*, 73 HARV. L.REV. 625, 652 (1960) (suggesting risk of future competition from employee falls to employer despite possible damage, increased by experience gained by employee).

The firm may well have a protectable interest in the time, energy, and money it expended in assisting Dr. Miller develop a practice. But, several factors, discussed below but not analyzed by the district court, should inform the decision. Accordingly, this question, too, must be analyzed on remand.

#### 4. Whether the non-compete provision was more restrictive than necessary to protect the firm's legitimate business interests

Even having asserted protectable business interests, Intermountain Eye still bears the burden to prove the extent of those interests and that the non-compete provision is no more restrictive than necessary to protect those interests. *Freiburger*, 141 Idaho at 420, 111 P.3d at 105.

#### (a) *Pinnacle Performance v. Hessing* is distinguishable and does not control the outcome.

Dr. Miller's reliance on *Pinnacle Performance* to say that the non-compete provision is fatally overbroad is misplaced. *Pinnacle Performance* involved a non-compete provision aimed at preventing the ex-employee from selling his services to "current and past" customers of the employer. *Pinnacle Performance*, 135 Idaho at 366, 17 P.3d at 310. The court wrote that, while employers cannot protect themselves against ordinary competition, they do have a protectable interest in customer relationships "established and/or nurtured" by the employee. *Id.* at 367, 17 P.3d at 311. But, it should be noted that ordinary competition was not at issue in *Pinnacle Performance*. The agreement contemplated current and former customers, one of which was the customer at the center of the controversy, with which the ex-employee had a relationship during his tenure with the employer. As a result, the statement in the decision that employers are entitled to protect themselves from competition for their existing or past customers cannot necessarily be extrapolated to mean those are the only customers that an employer can protect. Also, the decision did not concern other interests of the kind Intermountain Eye asserts here, which, as already demonstrated,

are protectable. The court's holding focused on the utter lack of a geographic limitation (which is present in this case) and the vagueness of the services that were prohibited (which is made clear in this case).

### (b) *Marshall v. Covington* does not control the outcome.

To support its argument that the non-compete provision in this case is not overbroad, Intermountain Eye points out that this Court has upheld a provision preventing a board-certified OB/GYN practitioner from practicing "medicine or surgery" for two years within a 25-mile radius of the employer's home city. *See Marshall v. Covington,* 81 Idaho 199, 339 P.2d 504. Intermountain Eye's synopsis of *Marshall* is correct.

However, *Marshall* is not particularly helpful in this case. First, it is thin on analysis. It contains several block quotes from cases in other jurisdictions, all saying generally that non-compete provisions in a physician's employment agreement are valid, so long as they are reasonable as to the parties, public, and durational and territorial scope. But, as Dr. Miller points out, the Court's focus in that case was on the durational and territorial[3] scope of the prohibition; the Court did not discuss the scope of activities prohibited—which is at issue in this case—and the issue was apparently not raised. The Court simply concluded, almost summarily, that the outright prohibition was a reasonable means to protect the clinic's business interests, without actually ever identifying exactly what the protectable business interests were. Moreover, the decision said simply, with no analysis or discussion, that the time period was reasonable and that the "overriding public interest in the preservation of the freedom of contract" outweighed any detriment to the public interest. *Marshall v. Covington,* 81 Idaho at 206, 339 P.2d at 506.

Second, time has in other respects passed *Marshall* by. *Marshall* did not cite the rule that a non-competition provision must be no more restrictive than necessary to protect the interest or interests at issue. That, of course, is the rule this Court now follows. *Freiburger,* 141 Idaho at 420, 111 P.3d at 105. Additionally, since *Marshall,* courts have defined the scope of employer's protectable business interests more clearly than in that case. Non-competitive activity is generally not protectable, at least in the medical profession. *See Valley Med. Specialists, supra,* 982 P.2d at 1285; *Ellis v. McDaniel,* 95 Nev. 455, 596 P.2d 222, 224–25 (1979); *Karlin v. Weinberg,* 77 N.J. 408, 390 A.2d 1161, 1169 (1978). So, to the extent that the non-compete provision in this case seeks to prevent Dr. Miller from practicing medicine at all, the firm must demonstrate a legitimate business interest in patients other than those seeking the kind of services Intermountain Eye provides. It does not assert such an interest and, regardless, it cannot. Intermountain Eye's practice is limited to ophthalmology services. Intermountain Eye has no legitimate business interest in patients the firm would not be competing for and, hence, a prohibition on providing services other than those provided by Intermountain Eye exceeds the scope of any legitimate business interest it has. Intermountain Eye almost concedes as much, having raised no objection to modification of the non-compete provision to preclude only the practice of ophthalmology.

Intermountain Eye had urged that the district court "blue pencil" the non-compete provision, if it found it overbroad. That is, the prohibition against the practice of medicine would be narrowed to prevent the practice of ophthalmology. However, in view of the requirement that a non-compete be no

---

3. The Court seemed to imply that the purpose of a non-compete provision was to protect the employer from competition for its patients by the ex-employee, but did not expressly say so. The effect of the Court's holding was that a prohibition against practicing in the geographic area in which the customers could be found, not necessarily limited to the actual customers, was permissible. The correct rule in evaluating the reasonableness of a non-compete provision's territorial prohibition was, said the Court, "the territorial scope of a restrictive covenant will be held reasonable if the area of the restraint is not broader than the territory throughout which the employee during the term of his employment was able to establish contact with his employer's customers." *Marshall,* 81 Idaho at 206, 339 P.2d at 508 (quoting 43 A.L.R.2d 164).

more restrictive than necessary, it is not clear that blue-penciling would be appropriate here. Even though the parties were at odds, it appears from the record that Intermountain Eye referred cornea patients to Dr. Miller, even after he began working at St. Luke's. Apparently, Intermountain Eye was unable to treat these patients, so it would appear there was no competition between the two in this area. Thus, just changing the restriction from "practice of medicine" to "practice of ophthalmology" would not be sufficient to tailor the non-compete provision so as to be no more restrictive than necessary. While the court may blue-pencil, if it can be done simply and accurately, the court will not do a substantial rewrite of the contract. Since the district court did not consider the issue of blue-penciling, even though it was raised, this is an issue that will need to be dealt with on remand. And, as we discuss below, this will have to be done in light of the extent to which the firm may protect its legitimate business interests.

**(c) The nature of the doctor-patient relationship affects the extent of Intermountain Eye's interest in protecting itself from competition by Dr. Miller.**

Since *Marshall,* courts—including this one—have considered the public interest impact of these agreements in determining the extent to which patients, existing and would-be, are protectable under the public interest prong of the test. The reason is that non-compete provisions between physicians and their employers implicate public policy concerns not present in the ordinary commercial context. A trend has evolved in some jurisdictions which recognizes that the doctor-patient relationship "cannot be easily or accurately compared to relationships in the commercial context." *Valley Med. Specialists,* 982 P.2d at 1283. Indeed, the doctor-patient relationship "goes beyond merely providing goods or services." *Murfreesboro Med. Clinic, PA,* 166 S.W.3d 674, 683 (Tenn. 2005). Thus, some jurisdictions apply a heightened level of scrutiny to already disfavored non-compete provisions in the medical setting. *See Valley Med. Specialists,* 982 P.2d at 1283; *Ohio Urology, Inc. v. Poll,* 72 Ohio App.3d 446, 594 N.E.2d 1027, 1031 (1991) (ordinary disfavor with which non-compete agreements are viewed is "especially acute" when considering reasonableness of non-compete agreements between physicians); *Iredell Digestive Disease Clinic v. Petrozza,* 92 N.C.App. 21, 373 S.E.2d 449, 455 (1988) (court "extremely hesitant to deny the patient-consumer any choice whatsoever").

When considering the degree to which a particular non-compete provision affects the "public interest," courts focus on both the general public's interest in access to care, *see Dick v. Geist,* 107 Idaho 931, 934–35, 693 P.2d 1133, 1137–38 (Ct.App.1985), and the patients' interests in continuity of care and access to the physician of their choice. *See Valley Med. Specialists,* 982 P.2d at 1284; *Karlin v. Weinberg,* 390 A.2d at 1170. Among the jurisdictions that treat non-compete agreements between physicians and their employers with heightened scrutiny, several note the American Medical Association's view (held since 1980) that these agreements are not in the public interest. *See, e.g., Valley Med. Specialists,* 982 P.2d at 1282; *Murfreesboro Med. Clinic,* 166 S.W.3d at 679–80; *but c.f. Karlin v. Weinberg,* 390 A.2d at 1168 n. 4 (court hesitant to "afford significant weight to those pronouncements of private professional organizations which have not been adopted by any governmental body or court"). They also draw parallels between the practices of medicine and of law, noting that non-compete agreements violate the attorney rules of professional conduct. *See Valley Med. Specialists,* 982 P.2d at 1282–83; *Murfreesboro Med. Clinic,* 166 S.W.3d at 683; *Karlin v. Weinberg,* 390 A.2d at 1171 (Sullivan, J., dissenting) (characterizing attorney-client and doctor-patient relationships as indistinguishable, noting each is "consensual, highly fiduciary, and peculiarly dependent on the patient's or client's trust and confidence in the physician consulted or attorney retained").

Tennessee's supreme court has ruled such agreements are against the public interest and are therefore unenforceable as a matter of law. *See Murfreesboro Med. Clinic,* 166 S.W.3d at 683–84. Other states' legislatures

have outlawed them. *See* Colo.Rev.Stat. Ann. § 8–2–113(3); Del.Code Ann. tit. 6, § 2707; Mass. Gen. Laws Ann. ch. 112, § 12X (1991). Still other courts have interpreted their antitrust statutes as prohibiting such agreements, even though those statutes were not aimed specifically at agreements between physicians. *See Odess v. Taylor,* 282 Ala. 389, 211 So.2d 805 (1968); *Bosley Med. Group v. Abramson,* 161 Cal.App.3d 284, 207 Cal.Rptr. 477 (1984); *Bergh v. Stephens,* 175 So.2d 787 (Fla.Dist.Ct.App.1965); *Gauthier v. Magee,* 141 So.2d 837 (La.Ct.App.1962); *W. Montana Clinic v. Jacobson,* 169 Mont. 44, 544 P.2d 807 (1976); *Spectrum Emergency Care, Inc. v. St. Joseph's Hosp. & Health Ctr.,* 479 N.W.2d 848 (N.D.1992). Other courts, however, continue to apply to non-compete agreements between physicians the same standards applicable in the ordinary commercial context and do not consider the difference between the doctor-patient relationship and ordinary commercial producer-customer relationship. *See Raymundo v. Hammond Clinic Ass'n,* 449 N.E.2d 276 (Ind.1983); *Rash v. Toccoa Clinic Med. Assocs.,* 253 Ga. 322, 320 S.E.2d 170 (1984); *Duneland Emergency Physician's Med. Group v. Brunk,* 723 N.E.2d 963 (Ind.Ct. App.2000); *Gant v. Hygeia Facilities Found. Inc.,* 181 W.Va. 805, 384 S.E.2d 842 (1989).

 We find that doctor-patient relationships are different from most other relationships between service providers and their customers. While the public has a strong interest in freedom of contract, that interest must be balanced against the public interest in upholding the highly personal relationship between the physician and his or her patient. While doctor-patient relationships are somewhat analogous to attorney-client relationships, requiring closer scrutiny than other consumer-provider relationships, regulating the practice of law is the business of this Court; regulating the practice of medicine is not. For that reason, an outright ban is unwise.[4] *See Murfreesboro Med. Clinic,* 166 S.W.3d at 685 (Holder, J., dissenting) (calling for a case-by-case analysis of the enforceabil-

ity of non-compete provisions between physicians). Instead, the reasonableness of a particular non-compete provision should be left to the finder of fact in light of the interests involved. *See Valley Med. Specialists,* 982 P.2d at 1283.

We adopt the view expressed by the supreme courts of Arizona and New Jersey. The extent of Intermountain Eye's interest in those patients Dr. Miller inherited when he joined the firm and those patients it provided him thereafter is limited by those patients' interests in continuity of care and access to the health care provider of their choice. *Valley Med. Specialists,* 982 P.2d at 1284; *Karlin v. Weinberg,* 390 A.2d at 1171. The reasonableness of the non-compete provision and practice fee was not evaluated against these interests and, therefore, a trial is necessary to determine whether the prohibition and practice fee are no more restrictive than necessary to protect these interests.

The firm's interest in protecting the time, money, and resources it spent in assisting Dr. Miller in developing a viable medical practice is similarly limited, since protecting that interest includes a prohibition on treating patients with whom it had no relationship and thus no goodwill. *See Weber v. Tillman,* 913 P.2d at 92. In other words, perhaps the firm should be able to protect its investment in its employee and its own interest in the marketplace, but there is less justification for a firm to protect itself against competition for those patients with whom the firm has established no goodwill, given the patients' interests described above. The extent of that business interest, and whether the practice fee is no more restrictive than necessary to protect it, must be determined by the trier of fact.

Another relevant factor in determining the extent of the firm's interest would be the degree to which Dr. Miller is using his former employment with Intermountain Eye to obtain patients. *See Weber,* 913 P.2d at 92 (protected interest exists where employee obtains unfair competitive advantage from employment with employer); *Fields Found.,*

---

4. The State Board of Medicine has not adopted a position on the wisdom of agreements such as the one in this case.

*Ltd. v. Christensen,* 103 Wis.2d 465, 309 N.W.2d 125, 130 (Ct.App.1981) (unfair competitive advantage existed where employee's identification with the employer's goodwill made him a more formidable competitor). It may be that, since Dr. Miller appears to be an in-house employee of St. Luke's, his patients primarily or exclusively are persons assigned to him by the hospital and not persons who were obtained as patients during his tenure with Intermountain Eye. This will need to be considered on remand. An additional factor to consider is the degree to which the training provided by the employer enabled the physician to succeed on his own. Since these factors were not considered by the district court, further factual inquiry is necessary to determine whether the prohibition and practice fee are no more restrictive than necessary to protect those interests.

## VI.

### CONCLUSION

Genuine issues of material fact exist on both substantive questions presented in this case. While the district court held, as a matter of law, that the non-compete provision was unambiguous, we find it to be so. The court must determine, based on further factual inquiry, when the non-compete was intended to commence. The district court failed to consider whether the non-compete provision is no more restrictive than necessary to protect Intermountain Eye's legitimate business interests. While the firm has asserted protectable business interests, the fact finder needs to determine the extent of those interests and whether the non-compete provision and practice fee are more restrictive than necessary to protect those interests.

The summary judgment is vacated and the case is remanded for further proceedings consistent with this opinion. Since we vacate the summary judgment, the award of attorney fees and costs is also vacated. We decline to award costs and attorney fees on appeal.

Justice BURDICK and Justices Pro Tem KIDWELL, JUDD, and SCHILLING concur.

