JOSEPH KARLIN, PLAINTIFF-RESPONDENT, v.
HARVEY WEINBERG, DEFENDANT-APPELLANT.

Argued January 24, 1978—Decided August 8, 1978.

410

Mr. *Richard L. Plotkin* argued the cause for defendant-appellant (*Messrs. Pitney, Hardin & Kipp,* attorneys; Mr. *Plotkin* and Mr. *Ira J. Kaltman,* on the brief).

Mr. *Ronald Reichstein* argued the cause for plaintiff-respondent (*Messrs. Beck, Reichstein and Guidone,* attorneys; Mr. *Reichstein,* on the brief).

The opinion of the court was delivered by

CLIFFORD, J. ██ We granted certification, 75 *N. J.* 5 (1977), to examine the issue of whether a post-employment restrictive covenant ancillary to an employment contract between physicians is *per se* unreasonable and hence unenforceable, as held by the trial court. The Appellate Division reversed. *Karlin v. Weinberg,* 148 *N. J. Super.* 243 (1977). Being disinclined to adopt a *per se* rule, we affirm the Appellate Division and approve the longstanding case law of this State that a restrictive covenant ancillary to an

employment contract between physicians is enforceable to the extent that it protects a legitimate interest of the employer, imposes no undue hardship on the employee, and is not injurious to the public.

## I

The factual setting is not at all unusual for this type of litigation. The parties are medical doctors engaged in the practice of dermatology. Plaintiff, Dr. Joseph Karlin, established his practice in Denville in 1966. In 1973 he employed defendant, Dr. Harvey Weinberg, on the latter's completion of his medical education, internship and residency requirements. Prior to this employment Dr. Weinberg had neither resided nor practiced medicine in New Jersey. The one-year employment contract, entered into on June 23, 1973 and effective July 1, 1973, contained the following termination clause, with which this litigation is concerned:

*TERMINATION*: (a) This agreement and Dr. Weinberg's employment hereunder shall be effective as of July 1, 1973, and shall continue for the term of one year but may be terminated at any time by mutual agreement in writing or by either party giving not less than 60 day's [sic] notice to the other party specifying the date of termination. Notwithstanding the termination of this agreement, the parties shall be required to carry out any provisions hereof which contemplate performance by them subsequent to such termination; and such termination shall not affect any liability or other obligation which shall have accrued prior to such termination, including but not limited to, any liability for loss or damage on account of default.

(b) Upon the termination of Dr. Weinberg's employment hereunder for any reason whatsoever, he shall not, for a period of five years thereafter, except with the written consent of Dr. Karlin, engage in the practice of dermatology within a 10 mile radius of 60 Broadway, Denville, New Jersey.

Prior to the expiration of this contract the parties decided to form a partnership and commenced negotiations over the terms of a partnership agreement. While no formal document resulting therefrom was ever executed, the parties do agree

that they practiced as partners after the expiration of the one-year employment contract. They disagree, however, as to whether their oral partnership arrangement contained any agreement covering a post-termination restraint. The partnership dissolved as of January 31, 1976 after a dispute over business practices. Plaintiff continued to conduct his practice at the previous address, 60 Broadway, Denville, and defendant opened his new medical office just a few doors away, at 92 Broadway.

The record contains an affidavit of Dr. Weinberg, dated March 6, 1976, in which he avers that from February 2, 1976, when he began to practice on his own, to the time of the affidavit he had treated approximately 130 patients, 60 of whom he had previously seen during his association with Dr. Karlin. Of the remaining 70 patients, 55 came to Dr. Weinberg in response to a newspaper advertisement announcing the opening of his new offices, and the other 15 were referred by other physicians. The affidavit discloses further that Dr. Weinberg's Denville practice requires some 16 hours a week, while four other part-time medical jobs in various locations in New York and New Jersey occupy the balance of his time.

Following Dr. Weinberg's opening of his separate practice, Dr. Karlin commenced this action seeking an injunction to enforce the restrictive covenant as well as damages for violation of that covenant appearing in the employment contract and in the partnership agreement under which the parties had practiced. Dr. Weinberg answered, denying the validity of the covenant, and filed a counterclaim for an accounting of his share of the partnership income and property. He also moved for an order of "partial summary judgment dismissing the complaint," urging that the restrictive covenant was invalid as a matter of law. In support thereof he relied principally on *Dwyer v. Jung,* 133 *N. J. Super.* 343 (Ch.), aff'd o.b., 137 *N. J. Super.* 135 (App. Div. 1975), holding that restrictive covenants among attorneys are *per*

*se* unreasonable and therefore void as contrary to public policy.

The trial court denied Dr. Karlin interlocutory relief and granted Dr. Weinberg's motion for partial summary judgment. In the course of an oral opinion the court noted the probable hardship on both Dr. Weinberg and the public should interlocutory relief be granted, and held that summary judgment dismissing the complaint was appropriate because restrictive covenants between physicians are *per se* unreasonable and hence unenforceable.[1] *Dwyer v. Jung, supra,* was thought by the court to be as applicable to physicians as to attorneys.

The Appellate Division reversed and remanded, holding that the trial court had erred in dismissing the complaint and in denying interlocutory relief as a matter of law. 148 *N. J. Super.* at 248. The court below reasoned that the rule of *Dwyer v. Jung, supra,* was based on canons of ethics governing lawyers, quite unlike those binding on physicians, and consequently *Dwyer* was inapplicable to restrictive covenants between physicians. 148 *N. J. Super.* at 246. It concluded that plaintiff had a legitimate interest entitled to protection and that this interest was recognizable absent a showing of detriment to the public. According to the Appellate Division such detriment had not been established conclusively in the proceedings before the trial court, given conflicting assertions set forth in affidavits of the parties on the community's need for Dr. Weinberg's services. *Id.* at 248.[2]

---

[1] For purposes of his motion for summary judgment, defendant stipulated that either the employment contract or oral partnership agreement contained a restrictive covenant. See *R.* 4:46–2.

[2] The Appellate Division rejected also defendant's assertion that the restrictive covenant contained in the employment agreement was ineffective because it was contained in an agreement which had expired. 148 *N. J. Super.* at 248. We agree with that conclusion. Unless the post-employment restraint was superseded by a subse-

## II

The validity of restrictive covenants between physicians was first recognized in this jurisdiction in *Mandeville v. Harman*, 42 *N. J. Eq.* 185 (Ch. 1889). In *Mandeville* defendant was employed by plaintiff under a contract containing a covenant by which defendant agreed not to practice medicine or surgery in Newark "at any time" after termination of his employment with plaintiff. 42 *N. J. Eq.* at 188. Defendant established an office in Newark upon expiration of the contract. Plaintiff thereupon sought an injunction enforcing the restrictive covenant. In discussing the applicable principles the vice-chancellor recognized that employment covenants between physicians were enforceable if reasonable.

The covenant under consideration is a contract in restraint of trade. Such is the designation universally applied to such engagements. And no principle of law is more generally recognized than that a contract which precludes a person from the right to employ his talents, his industry or his capital in any useful undertaking, is void. Whether the restraint be general or partial * * * the law starts out with the presumption that a contract in restraint of trade is void, and it is only by showing that the contract is good that this presumption will be rebutted. The rule is, not that a limited restraint is good, but that it may be good. It is valid when the restraint is reasonable when it imposes no shackle upon the party which is beneficial to the other. The authorities are uniform that such contracts are valid when the restraint they impose is reasonable, and the test to be applied in determining whether the restraint is reasonable or not * * * is this: to consider whether the restraint is such only as to afford a fair protection to the interest of the party in favor of whom it is given, and not so large as to interfere with the interest of the public. Whatever restraint is larger than the necessary protection of the party can be of no benefit to either. It can only be oppressive, and if oppressive, it is, in the eye of the law, unreasonable and void, on the ground of public policy, as being injurious to

---

quent agreement, something we cannot — and need not — ascertain from the present record, the postemployment covenant, if reasonable, is effective and not terminated by the expiration of the contract. See *Rosenberg v. D. Kaltman & Co.*, 28 *N. J. Super.* 459, 465 (Ch. 1953).

the interests of the public. The rule, as thus stated, is the law of this state.

> [42 *N. J. Eq.* at 189–90 (citations omitted).]

Although the court agreed with defendant's assertion that the covenant in question was for a longer period of time than necessary to protect plaintiff, and hence unreasonable and unenforceable, 42 *N. J. Eq.* at 191, the recitation of the general rule clearly demonstrates that restrictive covenants would be enforceable upon a showing that they provided needed protection to the covenantee without interfering with the interest of the public.

The principles first expressed in Mandeville were applied by the Court of Errors and Appeals in *Marvel v. Jonah*, 83 *N. J. Eq.* 295 (E. & A. 1914). There the plaintiff sought enforcement of a covenant contained in a partnership agreement which restricted defendant from practicing medicine in Atlantic City for a period of three years after the dissolution of the partnership. The vice-chancellor concluded that it would be unjust and unnecessarily oppressive to enforce the restrictive covenant against defendant, reasoning that even if plaintiff lost patients to defendant, plaintiff's practice would still be so large that he would be unable to service his patients without the aid of other assistants. The Court of Errors and Appeals, in reversing the judgment of the vice-chancellor and ordering enforcement of the covenant, recognized that plaintiff had an interest worthy of protection by a court of equity.

If [plaintiff] has built up a practice so large that he is unable to take care of it without the aid of qualified assistants, he is entitled to the emoluments thereof, and to be protected against the loss of those emoluments through illegal competition. It will hardly do to say that a man who has built up a business so extensive that he cannot handle it without the aid of a staff of assistants, suffers no loss or injury by its diminution in volume to such an extent that he no longer needs assistance to carry it on, provided that what remains of it is sufficient to fully occupy his own time. Common experience is to the contrary.

> [83 *N. J. Eq.* at 297–98.]

 In recent years, this Court has made it abundantly clear that it embraces the rule set forth in *Mandeville, supra,* and in *Marvel, supra,* that an employee's post-employment restrictive covenant is enforceable to the extent that it is reasonable under all the circumstances of the case. *Solari Industries, Inc. v. Malady,* 55 *N. J.* 571, 576 (1970); *Whitmyer Brothers, Inc. v. Doyle,* 58 *N. J.* 25, 32 .(1971). A post-employment restrictive covenant will be found to be reasonable when it protects the "legitimate" interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public, *Solari, supra,* 55 *N. J.* at 576; *Whitmyer, supra,* 58 *N. J.* at 32–33, and this despite the demonstrable differences between the sale of a business and a restrictive covenant in the employer-employee context.

██ Application of these tests to restrictive covenants between physicians in no wise leads to the conclusion that such covenants are *per se* unreasonable. While it is true that a physician (like any other employer) has no "legitimate" interest in preventing competition as such, *Whitmyer, supra,* 58 *N. J.* at 33, he does have a legitimate interest in the protection of patient relationships. *Marvel v. Jonah, supra,* 83 *N. J. Eq.* at 297; see also *Whitmyer, supra,* 58 *N. J.* at 33 ("[T]he employer has a patently legitimate interest * * * in protecting his customer relationships."). The instant case, which, as we have noted, is reflective of the typical factual situation, demonstrates the legitimacy of the employer-physician's interest in protecting his ongoing re-lationship with his patients. Dr. Karlin, by virtue of his efforts, expenditures and reputation, has developed a signifi-cant practice, and only if the restrictive covenant is given effect can he hope to protect in some measure his legitimate interest in preserving his ongoing relationship with his patients.[3]

---

[3]We cannot say, in light of the present record, that enforcement of the restrictive covenant will subject defendant to "undue hard-ship". Although the affidavits show that defendant will suffer ad-

## III

Defendant argues, however, that restrictive covenants among physicians are injurious to the public as a matter of law and are thereby unreasonable *per se*. Support for this assertion is said to be found in *Dwyer v. Jung, supra*. We disagree.

In Dwyer, three attorneys entered into a partnership agreement which included a covenant designating specific clients as belonging to individual partners upon termination of the partnership. The agreement provided also that "all partners shall be restricted from doing business with a client designated as that of another partner for a period of 5 (five) years." 133 *N. J. Super.* at 345. Upon dissolution of the partnership plaintiffs sought an accounting from defendant who then counterclaimed, alleging that plaintiffs had breached the restrictive covenant.

The trial court held that restrictive covenants between attorneys are injurious to the public as a matter of law and are thereby unreasonable *per se* and unenforceable. 133 *N. J. Super.* at 346–47. It reasoned that enforcement of such covenants would result in violation of DR2–108(A) of the *Disciplinary Rules of the Code of Professional Responsibility of the American Bar Association* (as amended by this court):

A lawyer shall not be a party to or participate in a partnership or employment agreement with another lawyer that restricts the right of a lawyer to practice law after the termination of a relationship created by the agreement except as may be provided in a bona fide retirement plan and then only to the extent reasonably necessary to protect the plan.

The court recognized that in light of the unique relationship between attorney and client, ordinary commercial standards

---

verse financial consequences as a result of enforcement of the covenant, a mere showing of personal hardship does not amount to an "undue hardship" that would prevent enforcement of the covenant. *Marvel v. Jonah, supra*, 83 *N. J. Eq.* at 299.

are inapplicable in determining the enforceability of lawyer restrictive covenants.

> Commercial standards may not be used to evaluate the reasonableness of lawyer restrictive covenants. Strong public policy considerations preclude their applicability. In that sense lawyer restrictions are injurious to the public interest. A client is always entitled to be represented by counsel of his own choosing. The attorney-client relationship is consensual, highly fiduciary on the part of counsel, and he may do nothing which restricts the right of the client to repose confidence in any counsel of his choice. No concept of the practice of law is more deeply rooted. The lawyer's function is to serve, but serve he must with fidelity, devotion and erudition in the highest tradition of his noble profession.
>
> [133 *N. J. Super.* at 346–47
> (footnote and citations omitted).]

While we endorse the sound holding of *Dwyer v. Jung, supra,* we find that case may readily be distinguished from the matter *sub judice.* Unlike the restrictive covenant in *Dwyer,* which prohibited the covenantor from maintaining any professional relationship whatsoever with a client, the covenant in the present case does not contain a blanket prohibition requiring the covenantor to end his relationship with his patients. While it is true that if the covenant is ultimately found enforceable some patients may have to travel a greater distance to Dr. Weinberg's new office (and conceivably some a shorter distance) than they travelled to his former office, no patient will, by force of law, automatically be deprived of continuing his ongoing relationship with his physician. Consequently, *Dwyer* has no applicability where a restrictive covenant among physicians authorizes the maintenance of the relationship within certain geographical or time limitations.

▮ Aside from any differences between the covenant in *Dwyer* and the covenant in the case at hand, *Dwyer* represents an exercise by the judicial branch of its unique constitutional responsibility for regulating the conduct of attorneys. Under our constitution this Court is charged with the exclusive responsibility of regulating the admission and discipline of

persons admitted to the practice of law. *N. J. Const.* (1947), Art. VI, § II, ¶ 3; *In re Gaulkin,* 69 *N. J.* 185, 189 (1976). Pursuant to this Constitutional mandate, the Court has adopted, by rule, most of the *Disciplinary Rules of the Code of the Professional Responsibility* of the American Bar Association. *R.* 1:14. One of these, DR2-108(a), as has been seen, forbids attorneys from entering into restrictive covenants of any scope.[4] Consequently, this Court, in exercising its supervisory role over attorneys, has determined that restrictive covenants among lawyers are detrimental to the public interest. The regulations governing physicians within this State, however, do not contain any restriction similar to DR2-108(A). Neither our statutes[5] nor the regulations of the State Board of Medical Examiners,[6] which

---

[4]It is well settled that restrictive covenants in employment contracts which fail to include reasonable geographical or temporal restrictions are partially enforceable to the extent they are reasonable under the circumstances, *Solari Industries, Inc. v. Malady, supra,* 55 *N. J.* at 585 — that is the court may compress or reduce the geographical areas or temporal extent of their impact so as to render the covenants reasonable. Although this "blue pencil" rule of limiting the geographical or temporal scope would apply to restrictive covenants among physicians, it can have no applicability to restrictive covenants among attorneys, which, under our Court Rules, are expressly forbidden, regardless of their geographical or temporal reasonableness.

[5]On November 23, 1976, a Bill was introduced in the New Jersey Assembly which, if enacted, would render restrictive covenants between physicians void and unenforceable (A. 2356). Although the Bill was reported out of the appropriate Assembly committee, no action was taken on it. A similar bill, A. 482, has been recently introduced in the Assembly, and is presently in Committee. Although defendant urges that the introduction of this bill demonstrates a legislative intent that restrictive covenants be considered injurious to the public, we do not draw any inference from the mere introduction of a bill in the Legislature absent any further action by that body either enacting or rejecting the bill.

[6]The parties call our attention to various Principles of Medical Ethics published by the American Medical Association. We are hesitant, however, in determining the validity of restrictive cove-

in regulating physicians, *N. J. S. A.* 45:9–6, serves a role similar to that of this Court in regulating attorneys, in any way restricts physicians from entering into restrictive covenants.

## IV

In sum, we do not find restrictive covenants between physicians to be *per se* unreasonable and unenforceable. If a factual determination is made that enforcement of the covenant will be injurious to the community, then the covenant will not be enforced and the public interest will be protected.

If the trial judge, upon remand of this case and after consideration of the factors alluded to here below, determines that the covenant is fully enforceable to its 10-mile limit, it may nevertheless be possible for the defendant to continue treating those of his former patients who desire his services, depending, of course, upon where he locates. Doubt-

---

nants among members of a profession, to afford significant weight to those pronouncements of private professional organizations which have not been adopted by any governmental body or court. Were we to afford weight to the Principles of Medical Ethics, however, they would in no way support a finding that restrictive covenants are *per se* injurious to the public interest. Although at one time these Principles stated that it was "debatable" whether restrictive covenants among physicians are in the best interests of the public, the most recently adopted provision recognizes that the effect on the public interest may be determined only by an examination of all of the surrounding facts.

4.63. Restrictive Covenants.

There is no ethical proscription against suggesting or entering into a reasonable agreement not to practice within a certain area for a certain time, if it is knowingly made, understood, and consistent with local law. Whether it is advisable as being in the best interest of the public depends on all of the surrounding facts. Ethically such agreements are not forbidden.

As is readily apparent, this provision calls for a full factual determination of the effects of the covenant upon the public, an approach we adopt herein.

less some inconvenience will be encountered in that situation. However, whatever the inconvenience may be, it seems slight when compared to the inequitable effects produced by adoption of a *per se* rule. Those inequitable results are graphically illustrated in the present case.

As has been noted plaintiff, through considerable effort and expenditure, has developed a sizeable practice. Defendant, who prior to his association with plaintiff had no contact whatsoever with the area in question, has utilized the relationships he developed with patients while employed by plaintiff as a foundation for a growing practice located a few hundred feet from his former employer. Adoption of a *per se* rule, however, would give the employing physician little, if any, protection in this situation. Aside from the inequity of not allowing a physician to protect himself, adoption of the *per se* rule would tend to make established physicians hesitant to employ younger associates and in turn deprive the younger physician of the opportunity to gain experience and to husband the necessary resources needed to establish a practice of his own. Even among experienced practitioners a *per se* rule might discourage physicians from establishing partnerships, thereby depriving the public of the potentially lower fees which ordinarily flow from the economies of scale attendant upon a partnership operation. Faced with the inequitable and potentially detrimental results to the parties and the community which might result from adoption of a *per se* rule, we prefer to provide for a case by case analysis as to whether enforcement of the covenant will be detrimental to the public interest.

## V

Upon remand, the trial court must determine whether the covenant in question "* * * protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public." *Solari Industries, Inc. v. Malady, supra,* 55 *N. J.* at 576. While

by no means attempting to provide an exhaustive list of the relevant factors to be considered in determining the enforceability of restrictive covenants among physicians, we will identify some of the relevant factors to be considered in determining the validity of such covenants, fully recognizing that as the facts of a particular case develop, definition of these factors may well be less clear-cut than this discussion implies.

We have elsewhere identified the legitimate interests of the employer as the protection of his relationship with the patients utilizing his practice. In this sense, the covenant will be unenforceable beyond the period of time which the employer needs to protect his practice. While a longer restriction may be permissible in medical specialties where the number of contacts between the physician and patient are relatively infrequent, the covenant should not be enforced beyond the period needed for the employer (or any new associate he may have taken on) to demonstrate his effectiveness to the patients. Nor will the covenant be enforceable beyond the geographical area needed to protect the employer's practice. Finally, the covenant will be unenforceable if it restricts the employee from engaging in activities not in competition with those of his former employer.

The trial court must determine also whether enforcement of the covenant will impose any *undue* hardship on the employee. In this connection the inquiry should look to the likelihood of the employee finding work in his field elsewhere. The trial court should examine also the reason for the termination of the relationship between the parties to the employment contract. Where this occurs because of a breach of the employment contract by the employer, or because of actions by the employer detrimental to the public interest, enforcement of the covenant may cause hardship on the employee which may fairly be characterized as "undue" in that the employee has not, by his conduct, contributed to it. On the other hand, where the breach

results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing by the employer, a court should be hesitant to find undue hardship on the employee, he in effect having brought that hardship on himself. Ordinarily a showing of personal hardship, without more, will not amount to an "undue hardship" such as would prevent enforcement of the covenant. See footnote 3 *supra*.

Finally, the trial court should examine the effect that enforcement of the covenant would have on the public interest. Significant here is the demand for the services rendered by the employee and the likelihood that those services could be provided by other physicians already practicing in the area. If enforcement of the covenant would result in a shortage of physicians within the area in question, then the court must determine whether this shortage would be alleviated by new physicians establishing practices in the area. It should examine also the degree to which enforcement of the covenant would foreclose resort to the services of the "departing" physician by those of his patients who might otherwise desire to seek him out at his new location. If the geographical dimensions of the covenant make it impossible, as a practical matter, for existing patients to continue treatment, then the trial court should consider the advisability of restricting the covenant's geographical scope in light of the number of patients who would be so restricted.

We recognize that as differing factual situations arise, other relevant factors will have to be considered by trial courts. In any factual situation, however, the ultimate analysis should look to the promisee's need for the covenant's protections and the effect of the covenant on the convenantor and the public. It is with this in mind that we remain confident of the *Solari* test's ability to provide fair protection to the parties while safeguarding the public interest.

## VI

The judgment of the Appellate Division is affirmed.

SULLIVAN, J. (dissenting). I would hold that the restrictive covenant in question contained in the employment agreement between two medical doctors is *per se* invalid as against public policy. Accordingly, I would affirm the ruling of the trial judge who granted a summary judgment in favor of defendant on this issue.

The parties to this suit are medical doctors specializing in the practice of dermatology. Defendant entered into plaintiff's employ in Denville, N. J. on July 1, 1973 for a one-year period. The written contract of employment contains this provision:

(b) Upon the termination of Dr. Weinberg's employment hereunder for any reason whatsoever, he shall not, for a period of five years thereafter, except with the written consent of Dr. Karlin, engage in the practice of dermatology within a 10 mile radius of 60 Broadway, Denville, New Jersey.

Upon expiration of the employment agreement the parties continued their association under an oral partnership arrangement, the terms of which are disputed but not essential to resolution of this controversy. I assume for present purposes that it was intended that Dr. Weinberg was to remain subject to the restrictive covenant even after commencement of the partnership. In January 1976, as a result of a falling out between the two doctors, defendant notified plaintiff that he was withdrawing from the partnership and intended to open his own office in Denville. This suit followed.

The art of healing the sick and the infirm is affected with a public interest. The restrictive covenant, which the Court is upholding in principle, does violence to the concept of the physician-patient relationship. A person requiring medi-

cal treatment and advice goes to the doctor of his or her choice. This is an important consideration because confidence in the doctor, although intangible, is a significant factor in providing effective medical care. Often, diagnosis and treatment require disclosure by the patient of personal and confidential information to the doctor, as well as thorough familiarity with the patient's past medical history. The law, recognizing the special nature of this relationship, has privileged communications between patient and physician. *N. J. S. A.* 2A:84A–22.2.

The relationship is so personal and so sensitive, and the right of a patient to consult the physician of one's own choice so fundamental, that a restrictive covenant which substantially intrudes on that relationship and interferes with that fundamental right should be held to be contrary to public policy. This policy does not exist for the benefit of the physician consulted, but rather to protect the patient's right to seek medical treatment from the doctor whom the patient believes is best able to treat him.

It is to be noted that when defendant opened his own office, approximately 50% of his patients were persons he had previously treated during his association with plaintiff. As to these persons, defendant had an established physician-patient relationship (knowingly fostered by plaintiff), which the patients are entitled to have protected. As to those patients, enforcement of the covenant would require that they travel substantial distances if defendant is to continue treating them. The other patients came to defendant in response to a newspaper advertisement announcing the opening of his new office, or were referred to him by other physicians. These patients have the right to consult with the doctor of their choice without undue inconvenience to themselves.

In *Dwyer v. Jung,* 133 *N. J. Super.* 343 (Ch. Div. 1975), aff'd o. b. 137 *N. J. Super.* 135 (App. Div. 1975), it was held that a restrictive covenant contained in a law partner-

ship agreement was void as against public policy. The reasons given in that case are highly analogous to those I have discussed above as warranting striking down the same kind of restrictive covenant in an employment agreement between physicians.

I do not read *Dwyer* as invalidating the restrictive covenant merely because it would result in a violation of DR2–108(A) of the *Disciplinary Rules of the Code of Professional Responsibility of the American Bar Association* (as amended by this Court). Rather, the trial judge said that a client is always entitled to be represented by counsel of his own choosing; that the attorney-client relationship is consensual, highly fiduciary on the part of counsel, and that the attorney may do nothing which restricts the right of the client to repose confidence in any counsel of his choice. He then held that a restrictive covenant between attorneys was contrary to public policy because it was in violation of these principles. DR2–108(A) was cited as an indication of the strength of that public policy.

The majority opinion herein, while it approves the *Dwyer* holding, would distinguish between the attorney-client situation and the physician-patient relationship, and would not extend the *Dwyer* rationale to the latter. I see no essential difference in principle. Both relationships are consensual, highly fiduciary and peculiarly dependent on the patient's or client's trust and confidence in the physician consulted or attorney retained.

The majority opinion refers to efforts, both past and present, in the Legislature of this State to have restrictive covenants between physicians declared to be void and unenforceable. While I agree that these efforts do not demonstrate legislative intent, they do indicate the controversial nature of this type of restrictive covenant.

I vote to affirm the judgment of the trial judge which held that the restrictive covenant in question was *per se* void as against public policy.

Justice PASHMAN and Judge CONFORD join in this dissent.

For affirmance—Chief Justice HUGHES and Justices CLIFFORD, SCHREIBER and HANDLER—4.

For reversal—Justices SULLIVAN and PASHMAN and Judge CONFORD—3.