IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
September 6, 2017 Session

## ADP, LLC v. ERIC MANCHIR

Appeal from the Chancery Court for Davidson County
No. 14-1043-III     Ellen H. Lyle, Chancellor

_____

No. M2016-02541-COA-R3-CV

_____

This appeal concerns an employment-related restrictive covenant.  Eric Manchir ("Manchir") worked as a sales manager for ADP, LLC ("ADP"), a company that deals in human resources and business outsourcing matters.  As a prerequisite to obtaining restricted stock options from ADP, Manchir consented to a restrictive covenant agreement ("the Agreement").  The Agreement contained, among other things, a non-competition clause extending to twelve months after Manchir left ADP.  New Jersey law governs the Agreement.  Manchir later resigned from ADP and went to work for an ADP competitor, Paycor, Inc. ("Paycor").  ADP sued Manchir in the Chancery Court for Davidson County ("the Trial Court") for breach of contract and sought specific enforcement of the Agreement.  ADP filed a motion for summary judgment, which the Trial Court granted.  The Trial Court also awarded ADP, pursuant to a provision in the Agreement, attorney's fees and costs.  Manchir appeals.  We hold, *inter alia*, that the Agreement is reasonable and enforceable under New Jersey law, that Manchir breached the Agreement, and that specific performance is an appropriate remedy.  We affirm the judgment of the Trial Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed;
Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and RICHARD H. DINKINS, J., joined.

Mekesha H. Montgomery and Jessica E. Hill, Nashville, Tennessee, and Matthew C. Blickensderfer, Cincinnati, Ohio, for the appellant, Eric Manchir.

William S. Rutchow, Nashville, Tennessee, for the appellee, ADP, LLC.

# OPINION

## Background

ADP hired Manchir as an entry level sales representative in July 2006. Manchir initially worked for ADP in Atlanta. ADP later promoted Manchir to sales manager and assigned him to Nashville. Manchir's territory included southern Nashville metropolitan area, Knoxville, Chattanooga and Birmingham. Manchir managed a team of sales representatives that focused on businesses with fewer than 50 employees.

In 2011, 2012, and 2013, ADP presented Manchir with a choice regarding restricted stock options. Manchir could obtain the stock options if he would consent to the Agreement containing, among other things, non-competition and non-solicitation clauses. Manchir consented electronically to the Agreement. We quote, as relevant, from the Agreement:

> d. **"Competing Business"** means any individual (including me), corporation, limited liability company, partnership, joint venture, association, or other entity, regardless of form, that is engaged in any business or enterprise that is the same as, or substantially the same as, the Business of ADP for that part of the business in which I have worked or to which I have been exposed during my employment with ADP (regardless of whether I worked only for a particular segment of that part of the business in which I worked—for example, business segments based on the number of employees a Client has or a particular class of business using an ADP product or service).

> \*\*\*

> **3. Non-Competition.** I agree that during my employment and for a period of twelve (12) months from the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, directly or indirectly, own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business anywhere in the Territory where doing so will require me to (i) provide the same or substantially similar services to a Competing Business as those which I provided to ADP while employed, or (ii) use or disclose ADP's trade secrets. However, after my voluntary or involuntary termination of my employment for any reason and with or without cause, nothing shall prevent me from owning, as an inactive investor, securities of any competitor of ADP which is listed on a national securities exchange.

-2-

**4. Non-Solicitation of and Non-Interference with Clients, Business Partners, and Vendors.**

  **a. Clients:** I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly, solicit, divert, appropriate, or accept any business from, or attempt to solicit, divert, appropriate, or accept any business from any Client for the purposes of providing products or services that are the same as or substantially similar to those provided in the Business of ADP, for any Client: (i) whom ADP provides products or services in connection with the Business of ADP; (ii) whom ADP has provided products or services in connection with the Business of ADP and with whom ADP reasonably expects business within the two (2) year period following my termination of employment from ADP; (iii) whom ADP has actively solicited in connection with the Business of ADP within the two (2) year period prior to my termination of employment from ADP; or (iv) about whom I have any trade secret information. I also agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Clients to cease doing business with ADP or materially alter their business relationship with ADP.

  **b. Business Partners:** I agree that during my employment and for a period of twelve (12) months following the voluntary or involuntary termination of my employment for any reason and with or without cause, I will not, either on my own behalf or for any Competing Business, directly or indirectly engage, contract with, solicit, divert, appropriate or accept any business from, or attempt to engage, contract with, solicit, divert, appropriate or accept any business from any Business Partner to provide to me or any Competing Business any product or service that is (a) the same as or substantially similar to the product or service provided to ADP and which ADP uses for, uses for obtaining, or distributes to, its Clients or (b) specialized, customized or designed by the Business Partner for ADP. This provision applies only to any Business Partner: (i) whom ADP currently has a commercial or business relationship with ADP in connection with the Business of ADP; (ii) whom ADP has had a commercial or business relationship in connection with the Business of ADP and with whom ADP reasonably expects business within the two (2) year period following my termination of employment from ADP; (iii) whom ADP has actively solicited for a commercial or business relationship in connection with the

Business of ADP within the two (2) year period prior to my termination of employment from ADP; or (iv) about whom I have any trade secret information. I also agree that I will not wrongfully induce or encourage or attempt to wrongfully induce or encourage any Business Partner to cease doing business with ADP or materially alter their business relationship with ADP.

***

**12. Tolling.** The restricted time periods in paragraphs three (3) through six (6) above shall be tolled during any time period that I am in violation of such covenants, as determined by a court of competent jurisdiction, so that ADP may realize the full benefit of its bargain. This tolling shall include any time period during which litigation is pending, but during which I have continued to violate such protective covenants and a court has declined to enjoin such conduct or I have failed to comply with any such injunction.

In 2014, Manchir resigned from ADP and went to work for Paycor, an ADP competitor. Manchir serves as a Regional Sales Director for Paycor. Manchir manages a team of sales representatives focusing on mid-market and major markets, involving businesses with 10-75 or over 75 employees, respectively. Manchir receives a commission on all sales his team makes. Manchir's Paycor territory includes Tennessee, Bowling Green and Hopkinsville, Kentucky, and Huntsville, Alabama. These territories overlapped somewhat with Manchir's previous territories at ADP. Whether Manchir breached the Agreement by competing with ADP or soliciting ADP clients, even indirectly through his sales team, is the crux of the dispute on appeal.

In July 2014, ADP filed suit against Manchir in the Trial Court alleging breach of contract. ADP requested that the Trial Court order specific performance. Discovery ensued in the matter. Both parties filed motions for summary judgment. The record contains the deposition testimony of, among others, Christopher Stratton, Manchir's boss when he worked at ADP. Stratton testified, in part, as follows:

Q. Of the information that you told me was what you would consider confidential, proprietary, trade secret information to ADP, was there any of that that Eric did not have access to?
A. Again, similar to the descriptions I have just given to the past few questions, at a certain level, his access would have been restricted as far as the scope of what he had access to. But everything that we have just discussed, he definitely had access to, you know, the clients and the referral

-4-

sources and the revenue generated, et cetera, for his given geography and team.

Q. Do you have any evidence that Eric has used any of that information to harm ADP in any way?

\*\*\*

THE WITNESS: I don't believe we have any specific instances where Eric has targeted an ADP client based on information that he may have had knowledge of prior, you know, to going over to Paycor. We do, as I mentioned earlier, after reviewing some data that was provided by Paycor, I did notice where there was quite a number of clients that Eric and his team converted to Paycor's services from ADP.

\*\*\*

Q. Do you have any evidence that that conversion to Paycor had anything to do directly with anything that Eric did?

A. I don't. I mean, the list that I was provided, it sort of determined which clients Eric had involvement with the sales process, where they came from prior to, you know, going to Paycor, et cetera. And I don't remember exactly what the tie-in was there. I do remember the figure. It was roughly 185- to $190,000 of ADP revenue that had been converted to Paycor's services. Again, since that time, whatever timeframe that list represented, that was essentially the sum of those former ADP clients.

Q. But you don't know if Eric had any direct involvement in converting those clients?

A. I personally do not, but his team did. And he was compensated for those conversions based on the data that I was looking at.

Manchir also was deposed. Manchir testified that he never personally competed with ADP or solicited ADP clients. He instead directed his sales team, and he did not believe he had breached the Agreement. Manchir testified, in part, as follows:

Q. All right. At Paycor you said that you get a commission on the sales that your team makes, correct?

A. That is correct.

Q. And is that the same for both major market and mid market?

A. That is correct.

Q. Okay. Do you get that commission whether you are involved in the sale or not?

-5-

A. That is correct.

Q. Do you get a bigger commission if you actually get involved in the sale?

A. No.

Q. Okay. Are you aware of any commissions that you have received on Paycor customers who were previously ADP customers?

A. Yes.

Q. Okay. Any from your mid-market people?

A. Yes.

Q. Do you know the names of those customers?

A. I wouldn't be able to tell you right this second.

Q. Is there a record of those anywhere?

A. Yeah, I'm sure. Yeah. We can get that.

Q. Okay.

A. I get a percentage of the overall team, what they sell, and my percentage is cut off the overall.

***

Q. -- since you left? Have you had any ADP customers contact you about coming over to Paycor?

A. No. Changed my phone number.

Q. Okay. Earlier you said that you had not taken any private or confidential ADP information with you when you left. Did you have access to private or confidential ADP information when you worked there?

A. We could get access. You know, sales reps, sales managers, you would have certain -- we used a CRM tool, so you can get prospect data, client data, things like that.

Q. What is a CRM tool?

A. A sales tool.

Q. Is that on some kind of computer software or something?

A. Yeah, just sales organizations use to track their prospects.

Q. And you could access, I think you said, prospect information and client information through that tool?

A. You'd have to request client information.

Q. Did you ever do that?

A. When I worked at ADP –

Q. Yeah.

A. -- for my ADP employees.

Q. That's what I mean. While you were working at ADP, would that be something you would do, is to request information from them?

A. We did different campaigns. We sold additional business to clients. So we would have a client campaign, so I would pass out everyone's client list. So, yes, I used that data as a manager at ADP.

Q. Any other confidential data that you would have used as a manager at ADP?

A. I mean, outside of client lists, I mean, that's, I mean, really the only confidential data that you would have.

Q. Were you provided information about, for example, marketing plans or campaigns?

A. I mean, I would know when they rolled out to the sales -- you know, the same time they rolled out to the sales team. But future plans, no.

Q. What about financial information regarding your team, how they were performing, that kind of thing?

A. Oh, yeah, so forecasting, you know, obviously, as a manager, I know what they make, what their commissions were, things like that.

***

Q. So for Paycor, one of your job responsibilities is to manage sales reps who sell to the same type of customers as you managed when you were at ADP, correct?

A. That is correct.

Q. Okay. Would that not violate this provision?

A. No, because I'm not selling similar services.

Q. Okay. You are not selling payroll services?

A. I'm selling payroll services, which is a very small percentage of what I sell.

Q. Does it say anywhere in here unless, of course, you are only doing it as a small percentage of what you do?

A. No, but that leaves it vague in the paragraph.

In August 2016, the Trial Court entered its thorough and detailed order granting ADP's motion for summary judgment and denying Manchir's. The Trial Court carved out a portion of the Agreement that required Manchir to refrain from soliciting prospective ADP customers but otherwise held the Agreement enforceable. The Trial Court ordered specific performance. The Trial Court stated as follows, in part:

[T]he Defendant argues that the Agreement is overbroad and would impose an undue hardship. In this regard the Defendant argues that he "would have to uproot himself and his family and move to an area more than 100 miles outside of his current home" if the Agreement is enforced. Defendant's

-7-

*Memorandum*, filed June 1, 2016, at 6. Yet, the undisputed facts are that the job at Paycor, the Defendant voluntarily accepted, as the Regional Sales Director, has responsibility for all of Tennessee and Kentucky—these are outside a 100 mile radius of Defendant's home.

More significantly, as a matter of law, New Jersey upholds geographic restrictions that are reflective of the territory in which an employee actually worked. *Trico Equip.,Inc. v. Manor*, 2009 WL 1687391, at *2 (D.N.J. 2009). The facts of record are that before joining the Plaintiff, the Defendant had no prior experience in the payroll industry. Thus any customer contacts the Defendant has built up were contacts he developed for the Plaintiff, and, therefore, are a legitimate basis for protection under New Jersey law. *See e.g. A.T. Hudson & Co., Inc. v. Donovan*, 216 N.J. Super. 426, 434, 524 A.2d 412 (App. Div. 1987).

Lastly, as established above in the statement of undisputed facts of record, both Paycor and the Plaintiff assign sales territories based upon zip codes. The Plaintiff's calculations establish that Paycor has assigned the Defendant a total of 500 zip codes. Of these, 303 do not overlap with the Defendant's former ADP territories. Also, many of these Paycor-only zip codes are within 100 miles of the Defendant's Mt. Juliet home. The result is that there are large areas of Tennessee, southern Kentucky, northern Georgia and Alabama that Defendant Manchir is responsible for in his job with Paycor that do not overlap with his former ADP area.

From the foregoing, as a matter of law and fact, the Court concludes that the Agreement is not geographically overbroad and its enforcement imposes no undue hardship on Defendant Manchir.

In addition to the claim of overbroad geographic scope just dismissed, the Defendant asserts that the Agreement's restriction on the Defendant soliciting prospective clients of ADP is overbroad, citing *Platinum Mgmt., Inc. v. Dahms*, 285 N.J. Super. 274, 298, 666 A.2d 1028, 1039 (Ch. Civ. 1995); *ADP, LLC v. Jacobs*, No. CIV.A. 2:15-3710 JLL, 2015 WL 4670805 (D.N.J. Aug. 5, 2015); *ADP, LLC v. Lynch*, No. 2:16-01053 (WJM), 2016 WL 3574328, at *1 (D.N.J. June 30, 2016). Based upon the rationale in these cases concerning the need for notice of violative conduct, the Court concludes the Defendant is correct. Accordingly, the Court modifies the Agreement to carve out and not enforce the restriction contained in the second clause of paragraph 4(a)(ii), "and with whom ADP reasonably expects business within the two (2) year period following my termination from ADP."

***

[T]he Court finds that while there are some differences in the services the Defendant performs at Paycor from those he performed at ADP, they are not material. The undisputed facts provided above establish that at Paycor the Defendant's duties, client sector and types of products are the same or substantially similar. There also is an overlap in some of the territories. Moreover, the Defendant's self-regulation of no personal involvement in soliciting or selling to ADP customers is not a defense to breach because the Agreement precludes not only direct but also indirect solicitation or acceptance of business from ADP clients. The record establishes that the Defendant trains his Paycor team to sell, the team sells to ADP clients, and the Defendant shares in the team's commissions on sales to ADP customers. The record establishes breach.

*** 

T]he Court concludes that under New Jersey law once the breach of a restrictive covenant is established, as found above, the inadequacy and the intangible nature of the damages in such cases is recognized by the law, and specific performance of the restrictive covenant is an appropriate remedy . . . .

The Trial Court's order was not final, however, as the issue of attorney's fees and costs remained outstanding. In its December 2016 final order, the Trial Court awarded ADP $94,307.75 in attorney's fees and $2,583.25 in costs. The Trial Court ordered Manchir to refrain from the following conduct:

A. Directly or indirectly own, manage, operate, join, control, be employed by or with, or participate in any manner with a Competing Business (as that term is defined in the parties' Agreement), including Defendant's current employer, Paycor, in the following Restricted Territories where doing so would require Defendant to (i) provide the same or substantially similar services to a Competing Business as those he provided to Plaintiff while employed with Plaintiff, or (ii) use or disclose ADP's trade secrets. The Restricted Territories are comprised of the zip code territories listed in Exhibit A hereto, which are the territories Manchir supervised during his last two years of employment with ADP. Competitive activities from which Manchir is Page 717 prohibited include, but are not limited to, providing services or supervising employees who are providing services for Paycor in any of the zip codes listed in Exhibit A.
B. Directly or indirectly solicit or accept any business from any ADP customer, any entity ADP had actively solicited in the two years prior to

Manchir's resignation and/or any ADP customer about whom Manchir has any trade secret information. This prohibition includes any "indirect" solicitation or acceptance of business, such as Manchir supervising Paycor employees who directly solicit ADP customers and/or Manchir accepting commissions associated with sales to ADP customers.
C. Directly or indirectly engage, contract with, solicit, divert, appropriate or accept any business from any business partner of ADP (such as CPA firms) as set forth in Paragraph 4(b) of the parties' Agreement.
D. Directly or indirectly, hire, solicit, recruit or encourage to leave ADP, any current employees of ADP.

Manchir is also prohibited, at any time, from disclosing, using, reproducing, distributing or otherwise disseminating ADP's Confidential Information (as defined in the parties' Agreement) or trade secret information.

Manchir filed a motion to stay enforcement of the judgment. In January 2017, the Trial Court entered an order granting, upon posting of bond, Manchir's motion to stay enforcement of the judgment pending appeal. Manchir timely appealed to this Court.

## Discussion

Although not stated exactly as such, Manchir raises the following issues on appeal. 1) whether the Trial Court erred in finding the Agreement enforceable under New Jersey law; 2) whether the Trial Court erred in finding that Manchir breached the Agreement; 3) whether the Trial Court erred in ordering specific performance of the Agreement; and, 4) whether the Trial Court erred in awarding attorney's fees and costs to ADP.

The material facts of this case are not in dispute. The parties agree substantially as to what Manchir did, and the Agreement, obviously, says what it says. It is the legal implication of the undisputed facts that is at issue. This case was disposed of by means of summary judgment. As our Supreme Court has instructed regarding appellate review of a trial court's ruling on a motion for summary judgment:

> Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Tenn. R. Civ. P. 56.04. We review a trial court's ruling on a motion for summary judgment de novo, without a presumption of correctness. *Bain v. Wells*, 936 S.W.2d 618, 622 (Tenn. 1997); *see also Abshure v. Methodist Healthcare–Memphis Hosp.*, 325 S.W.3d 98, 103 (Tenn. 2010). In doing

so, we make a fresh determination of whether the requirements of Rule 56 of the Tennessee Rules of Civil Procedure have been satisfied. *Estate of Brown*, 402 S.W.3d 193, 198 (Tenn. 2013) (*citing Hughes v. New Life Dev. Corp.*, 387 S.W.3d 453, 471 (Tenn. 2012)).

* * *

[I]n Tennessee, as in the federal system, when the moving party does not bear the burden of proof at trial, the moving party may satisfy its burden of production either (1) by affirmatively negating an essential element of the nonmoving party's claim or (2) by demonstrating that the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the nonmoving party's claim or defense. We reiterate that a moving party seeking summary judgment by attacking the nonmoving party's evidence must do more than make a conclusory assertion that summary judgment is appropriate on this basis. Rather, Tennessee Rule 56.03 requires the moving party to support its motion with "a separate concise statement of material facts as to which the moving party contends there is no genuine issue for trial." Tenn. R. Civ. P. 56.03. "Each fact is to be set forth in a separate, numbered paragraph and supported by a specific citation to the record." *Id*. When such a motion is made, any party opposing summary judgment must file a response to each fact set forth by the movant in the manner provided in Tennessee Rule 56.03. "[W]hen a motion for summary judgment is made [and] . . . supported as provided in [Tennessee Rule 56]," to survive summary judgment, the nonmoving party "may not rest upon the mere allegations or denials of [its] pleading," but must respond, and by affidavits or one of the other means provided in Tennessee Rule 56, "set forth specific facts" *at the summary judgment stage* "showing that there is a genuine issue for trial." Tenn. R. Civ. P. 56.06. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co.*, 475 U.S. at 586, 106 S. Ct. 1348. The nonmoving party must demonstrate the existence of specific facts in the record which could lead a rational trier of fact to find in favor of the nonmoving party. If a summary judgment motion is filed before adequate time for discovery has been provided, the nonmoving party may seek a continuance to engage in additional discovery as provided in Tennessee Rule 56.07. However, after adequate time for discovery has been provided, summary judgment should be granted if the nonmoving party's evidence *at the summary judgment stage* is insufficient to establish the existence of a genuine issue of material fact for trial. Tenn. R. Civ. P. 56.04, 56.06. The focus is on the evidence the nonmoving party comes

forward with at the summary judgment stage, not on hypothetical evidence that theoretically could be adduced, despite the passage of discovery deadlines, at a future trial.

*Rye v. Women's Care Cntr. of Memphis, MPLLC*, 477 S.W.3d 235, 250, 264-65 (Tenn. 2015).

We first address whether the Trial Court erred in finding the Agreement enforceable under New Jersey law, which both parties agree governs the Agreement. New Jersey law concerning restrictive covenants was discussed in a recent federal case as follows:

Restrictive covenants, such as the non-compete and non-solicitation provisions in the Restrictive Agreement here, may be enforced. They must be scrutinized closely, however, because they stifle free competition and the individual's right to exploit his skills and labor. A non-solicitation provision is not valid if its sole purpose is to restrict competition, but it may be valid to the extent it furthers some other legitimate goal of the employer. *See Solari Indus., Inc. v. Malady*, 264 A.2d 53 (N.J. 1970); *Whitmyer Bros. v. Doyle*, 274 A.2d 577 (N.J. 1971); *see also A.T. Hudson & Co., Inc. v. Donovan*, 216 N.J. Super. 426, 432-34, 524 A.2d 412 (App. Div. 1987) (analyzing a non-solicitation clause under *Solari*, and recognizing *Solari* as "the seminal case").

Under the approach of the *Solari/Whitmyer* line of cases, a non-solicitation provision is enforceable to the extent it is reasonable under the circumstances of the case. *Karlin v. Weinberg*, 390 A.2d 1161, 1166 (N.J. 1978). A non-compete will be found reasonable if it "(1) protects the legitimate interests of the employer, (2) imposes no undue hardship on the employee, and (3) is not injurious to the public." *Id*. (numbering added; internal quotations and citations omitted). *See also The Community Hosp. Grp., Inc. v. More*, 869 A.2d 884, 897 (N.J. 2005) (citing *Karlin*). Furthermore, New Jersey law authorizes the Court to modify, or "blue pencil" a restrictive covenant to a reasonable "scope of activity" if it crosses the line into unreasonableness. *Kadi v. Massotto*, No. A-2555-O7T2, 2008 WL 4830951, at *8 (N.J. Super. Ct. App. Div. Nov. 10, 2008) (internal quotation marks and citation omitted).

*Saturn Wireless Consulting, LLC v. Aversa*, Civ. No. 17-1637 (KM/JBC), 2017 WL 1538157, at *12 (D.N.J. April 26, 2017) (Footnote omitted).

Under the *Solari* test, our initial inquiry is whether the Agreement protects ADP's legitimate interests, which we answer in the affirmative. ADP had a legitimate interest in protecting its relationships with customers. The lifeblood of ADP's business, as well as that of its competitor Paycor, is development and maintenance of customer relationships. It is both legitimate and reasonable that ADP would wish to prevent, at least for a limited time period, certain of its customers from being poached by an employee who just left for a competitor.

We next consider whether the Agreement imposed an undue hardship on Manchir. With respect to the non-compete and non-solicitation clauses, the Agreement is limited in scope. Manchir is not prevented from engaging in his livelihood. Rather, he simply must refrain from competing against ADP in a limited area or soliciting certain of its customers for a year. As the Trial Court found, "there are large areas of Tennessee, southern Kentucky, northern Georgia and Alabama that Defendant Manchir is responsible for in his job with Paycor that do not overlap with his former ADP area." The Trial Court further reduced any hardship imposed by the Agreement by carving out the provision requiring Manchir to refrain from soliciting prospective ADP customers. The Agreement, so modified, poses no undue hardship to Manchir, who may continue to earn his living in numerous other territories.

Finally, there is no evidence that the Agreement is injurious to the public. While restrictive covenants are disfavored under New Jersey, they are not prohibited and will be enforced if these required conditions are met. In the instant case, we believe the Agreement is sufficiently tailored and narrow in scope to be enforceable, and is not merely a restraint on general competition. We hold, as did the Trial Court, that the Agreement is reasonable and enforceable under New Jersey law.

We next address whether the Trial Court erred in finding that Manchir breached the Agreement. Manchir argues that he never solicited any ADP clients at Paycor and that he never disclosed any ADP secrets. ADP argues that Manchir is competing against it in contravention of the Agreement, even if indirectly, through his sales team. Manchir directs and trains his sales team. Manchir is compensated for the work his sales team performs. To adopt Manchir's argument, he could direct, train, and supervise his team to compete against ADP and solicit ADP customers, but so long as he is not in direct contact with ADP customers, he is not in breach of the Agreement. We reject this reasoning. The Agreement prohibits direct or indirect competition. Moreover, such an interpretation as Manchir's effectively would hollow out the Agreement, which he entered into voluntarily in order to receive certain benefits provided him by the Agreement, by insulating him from its terms while allowing his team to act on his behalf. We hold, again as did the Trial Court, that Manchir breached the Agreement.

We next address whether the Trial Court erred in ordering specific performance of the Agreement. Whether and when specific performance may be ordered under New Jersey law has been discussed as follows:

> In general, to establish a right to the remedy of specific performance, a plaintiff must demonstrate that the contract in question is valid and enforceable at law, *Jackson v. Manasquan Sav. Bank*, 271 N.J. Super. 136, 144 n. 8, 638 A.2d 165 (Law Div. 1993); 25 *Williston, Contracts* (Lord ed., 2002), § 67:2 at 186, that the terms of the contract are "expressed in such fashion that the court can determine, with reasonable certainty, the duties of each party and the conditions under which performance is due," *Salvatore v. Trace*, 109 N.J. Super. 83, 90, 262 A.2d 409 (App. Div. 1969), *aff'd o.b.*, 55 N.J. 362, 262 A.2d 385 (1970); *accord Barry M. Dechtman, Inc. v. Sidpaul Corp.*, 89 N.J. 547, 552, 446 A.2d 518 (1982), and that an order compelling performance of the contract will not be "harsh or oppressive," *Stehr v. Sawyer*, 40 N.J. 352, 357, 192 A.2d 569 (1963); *Ridge Chevrolet-Oldsmobile, Inc. v. Scarano*, 238 N.J. Super. 149, 155, 569 A.2d 296 (App. Div. 1990).

*Marioni v. 94 Broadway, Inc.*, 374 N.J. Super. 588, 598-99 (App. Div. 2005)(Footnotes omitted).

In the present case, damages are difficult to quantify with specificity. ADP acknowledges that it cannot pinpoint instances where Manchir personally solicited ADP customers or wrongly utilized confidential ADP information he possessed. However, the record does establish that Manchir's sales team, which he trains and directs, competes with ADP and that Manchir receives a commission from their sales. Under these circumstances, requiring Manchir to adhere to the Agreement for its prescribed duration as relevant is a reasonable remedy.

Manchir asserts that ADP's failure to seek a preliminary injunction is a tacit concession that ADP did not suffer any damages. Indeed, a number of cases involving restrictive covenants governed by New Jersey law reveal that preliminary injunctions sometimes are sought in these matters. However, Manchir fails to establish that ADP somehow was obligated to seek a preliminary injunction. Parties generally may not dictate the legal strategies of their adversaries. Although this litigation has been fairly protracted, there is no hint that ADP "sat" on its claim or otherwise tried to game the judicial process. ADP's decision not to seek a preliminary injunction did not preclude them from pressing this action on to its ultimate resolution by summary judgment.

Specific performance would not be harsh or oppressive because Manchir can continue to practice his livelihood in numerous other territories. In time, the non-competition and non-solicitation clauses will expire, and Manchir can compete freely with ADP. Meanwhile, Manchir must adhere to the Agreement, which he entered into voluntarily with ADP in order to obtain restricted stock options. We affirm the Trial Court in its order of specific performance.

The final issue we address is whether the Trial Court erred in awarding attorney's fees and costs to ADP. Manchir argues that "the award of attorneys' fees to ADP should be reversed because the summary judgment in favor of ADP should be reversed." Since we affirm the Trial Court's grant of summary judgment to ADP, Manchir's argument fails. We affirm the Trial Court as to its award of attorney's fees and costs to ADP, and on all other issues.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Eric Manchir, and his surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE